PUBLIC VERSION

DAVID R. EBERHART (S.B. #195474)
deberhart@omm.com
SAURABH PRABHAKAR (S.B. #300891)
sprabhakar@omm.com
KAITLYN GOSEWEHR (S.B. #313458)
kgosewehr@omm.com
RUI LI (S.B. #320332)
rli@omm.com
O'MELVENY & MYERS LLP
Two Embarcadero Center
28th Floor
San Francisco, California 94111-3823
Telephone:    +1 415 984 8700
Facsimile:    +1 415 984 8701

Attorneys for Plaintiffs
AURIS HEALTH, INC.,
VERB SURGICAL INC., and
CILAG GMBH INTERNATIONAL

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| AURIS HEALTH, INC., VERB SURGICAL INC., and CILAG GMBH INTERNATIONAL, <br><br> Plaintiffs, <br><br> v. <br><br> NOAH MEDICAL CORPORATION, ENRIQUE ROMO, DIANA CARDONA UJUETA, KENNETH NIP, and DOES ONE through TEN inclusive, <br><br> Defendants. | Case No. 3:22-cv-08073 <br><br> **COMPLAINT FOR:** <br><br> 1. MISAPPROPRIATION OF TRADE SECRETS IN VIOLATION OF THE DEFEND TRADE SECRETS ACT, 18 U.S.C. § 1836 *ET SEQ.* (AGAINST ALL DEFENDANTS) <br> 2. BREACH OF WRITTEN CONTRACT (AGAINST ROMO) <br> 3. TORTIOUS INTERFERENCE WITH CONTRACT (AGAINST NOAH) <br> 4. BREACH OF WRITTEN CONTRACT (AGAINST CARDONA) <br> 5. BREACH OF WRITTEN CONTRACT (AGAINST NIP) <br> 6. CALIFORNIA STATUTORY UNFAIR COMPETITION (CAL. BUS. & PROF. CODE § 17200) (AGAINST NOAH) <br><br> JURY TRIAL DEMAND |

1

**INTRODUCTION**

2      1.      Plaintiffs Auris Health, Inc. ("Auris"), Verb Surgical Inc. ("Verb"), and Cilag

3    GmbH International ("Cilag") (collectively "Plaintiffs") bring this action to stop the shameless,

4    systematic, and ongoing misappropriation of trade secrets by Defendant Noah Medical

5    Corporation ("Noah") and former Auris employees Enrique Romo, Diana Cardona Ujueta,

6    Kenneth Nip, and Does 1-10 (collectively, "Defendants"). Among other things, the three former

7    employees collectively stole at least 26,000 Auris, Verb, and Cilag documents comprising 81

8    gigabytes of data. This data includes significant trade secret material—including source code,

9    designs, and test cases—that is directly relevant to the individual defendants' work at Noah. And

10   there is incontrovertible evidence that Noah used at least some of these stolen trade secrets: a

11   Noah patent application includes stolen Auris trade secrets.

12     2.      Auris was founded in 2007 and led by Dr. Frederic Moll, a pioneer in the field of

13   robotic surgery. Auris's MONARCH™ Platform is the first and only multispecialty flexible

14   robotic platform cleared for use in both bronchoscopy and urology. It is currently used in

15   minimally invasive procedures to assist in the diagnosis of lung disease, and Auris anticipates that

16   it will soon be used for the removal of kidney stones. Auris's Monarch Platform required

17   substantial time and effort to reach commercialization: 11 years from inception to obtaining FDA

18   clearance for bronchoscopy applications. In the fiercely competitive medical robotics market,

19   Auris takes great pains to keep its development work confidential. In 2019, Auris was acquired by

20   Ethicon, Inc., a subsidiary of Johnson & Johnson ("J&J").

21     3.      Verb was founded in 2015 as a joint venture between J&J and Verily Life

22   Sciences. Verb's mission was to build a digital surgery ecosystem by combining robotics,

23   advanced visualization, advanced instrumentation, data analytics, and connectivity for operating

24   room professionals. As a new company aiming to disrupt the competitive surgical robotics

25   market, Verb kept its development work and technology confidential. In early 2020, J&J acquired

26   complete ownership of Verb and integrated Verb and Auris. Today, Verb and Auris[1] operate

27

28   _____

[1] All subsequent references to Auris in this Complaint refer to the combined Auris and Verb
entity unless expressly stated otherwise.

together within J&J's Robotics and Digital Solutions business, which is developing a new general surgery robotics offering.

4.      Cilag is a wholly owned subsidiary of J&J. Cilag owns certain intellectual property rights in the medical robotics technologies described herein.

5.      Noah is a new player in the medical robotics field. A former Auris executive, Dr. Jian Zhang, founded Noah in 2018 and serves as its CEO. In March 2022, Noah announced the development of its "Galaxy System," a bronchoscopic robotic system on the cusp of commercialization within a mere four years of Noah's founding.[2] Defendant Enrique Romo ("Romo") publicly claimed in August 2022 that Noah also has a second product in development and a third being conceptualized.[3] The speed of Noah's product development is a direct result of Noah's misappropriation of Plaintiffs' trade secrets.

6.      Noah's knowledge of Plaintiffs' trade secrets starts at the top: Noah's founder and CEO Zhang was Auris's second employee. After his departure from Auris in February 2015, he retained Plaintiffs' documents that he *still* has not returned. And he has done so even after Noah acknowledged that he possessed those documents and represented, many months ago, that Noah would promptly return them to Auris.

7.      Noah employs another senior executive with deep knowledge of Plaintiffs' trade secrets: Defendant Romo is Noah's Vice President of Research and Innovation. Previously, Romo supervised for several years Auris's early-stage innovations for its robotic platforms, and he had a hand in nearly all aspects of research and development at Auris. By virtue of his position, Romo was uniquely well positioned to access and take Plaintiffs' trade secrets upon his departure. And he did so: Although Noah operates in secrecy and has not yet shipped any products, Plaintiffs have already uncovered at least one instance where Noah used Auris trade secrets misappropriated by Romo to apply for a patent.

8.      Romo's misappropriation is not limited to Noah's patent application at issue. Rather, Auris has now learned that Romo took a treasure trove of Plaintiffs' confidential

---

[2] https://www.noahmed.com/.
[3] https://www.therobotreport.com/lessons-learned-in-medical-robotics-development/.

documents with him, including by (1) emailing himself a presentation depicting an endoscopic system developed by his team at Auris that bears a striking similarity to the subject of Noah's patent application; (2) using his personal cellphone to take dozens of screenshots of Auris emails containing confidential program updates, product forecasts, and notes from prototype testing; and (3) on information and belief,[4] copying dozens of files related to his work at Auris to external USB drives in the final few months before his departure from Auris. The content of the files Romo misappropriated includes trade secret information about Auris's innovative solutions to challenges faced in the medical robotics space, photographs and notes from demos of Plaintiffs' technologies, confidential budgets and planning information for Auris platforms, and other confidential information. On information and belief, after copying Plaintiffs' files to an external device in the days before his departure, Romo then deleted files from his Auris laptop to cover his tracks.

9.      Noah's misappropriation is not limited to Romo. Rather, Noah has engaged in a systematic process of hiring other Auris employees that has maximized Noah's ability to obtain Auris trade secrets. Since mid-2020, and led by Defendant Romo's recruiting efforts, Noah has hired at least sixteen Auris engineers at all levels of seniority who either affirmatively misappropriated or—at best—retained Plaintiffs' property when they departed. All of the former Auris employees, including the individual defendants named in this complaint, have contractual obligations to maintain the secrecy and refrain from use of Plaintiffs' trade secrets. Plaintiffs' investigation to date demonstrates that at least the three individuals named as defendants in this complaint violated their contractual obligations and stole Plaintiffs' trade secrets.

10.      Noah also hired Defendant Diana Cardona Ujueta ("Cardona")—another former Auris employee who stole an extensive set of Auris trade secrets. Cardona was an Auris Senior Robotics & Controls engineer, and she had a key role in the design and testing of Auris's instrument manipulators. Cardona's misappropriation was methodical: she undertook a months-long process to gather her Auris lab notebooks and other trade secrets belonging to Plaintiffs—a

---

[4] Factual contentions pled herein on information and belief will likely have evidentiary support after a reasonable opportunity for discovery.

process that she continued after she interviewed for a job with Noah and met with Defendant Romo—and she stole those materials from Plaintiffs. Forensic evidence shows that, at the very least, she accessed those stolen Auris lab notebooks after she commenced work at Noah.

11.    Further, Noah hired Defendant Kenneth Nip ("Nip"), who is a former Auris Manufacturing Engineering Manager. Nip is intimately familiar with the process and strategy for manufacturing Auris's bronchoscopes—information that would speed Noah's ability to make its own bronchoscopic robotic system. And when he left for Noah, Nip stole trade secret documents comprising the manufacturing and process "recipes" to make Auris bronchoscopes.

12.    On June 2, 2020, Noah filed a provisional patent application US 63/033,428 for a robotic endoscopy system (the "Noah-Romo Provisional"). That application listed Romo as the sole inventor. The device depicted in the Noah-Romo Provisional closely resembled a device developed by Auris's Research and Innovation team primarily in 2018, as shown below:



| 2020 Noah-Romo Provisional | 2018 Auris Internal Presentation |

The innovations described in the Noah-Romo Provisional disclosure do not belong to Noah; rather, they represent Plaintiffs' trade secrets misappropriated by Romo. The timing of this application is also inconsistent with the claim that Romo invented this during his employment at Noah: Noah filed the Noah-Romo Provisional within weeks of Romo joining the company. Auris,

however, did not learn of the Noah-Romo Provisional until after December 2021 when the application was made public.

13.     In early 2021, Noah's hiring of Auris employees accelerated. Accordingly, Auris wrote Noah's CEO Zhang on May 17, 2021 to remind him of the former Auris employees' continuing contractual obligations to protect Auris's trade secrets and to refrain from using them at Noah. Zhang sent a terse response on May 26, 2021 that claimed, in part, "Our employees are instructed to be mindful of confidentiality obligations to their former employers, and we understand that each of them intends to comply with such obligations."

14.     A few weeks later, an individual named Kalpit Gajera downloaded in the 48 hours before his departure from Auris thousands of confidential project files and the entire requirement set for Auris's robotic platform. He started work at Noah three days later. Auris promptly sued Gajera.

15.     Over the next several months, Plaintiffs learned that several other Noah employees had taken or retained Plaintiffs' confidential information. Plaintiffs promptly took steps to confirm that Auris's information was not being used by Noah's employees and that all of Plaintiffs' confidential information was returned to them. But Noah engaged in a pattern of conduct designed to assure Auris that it was "returning" Auris's information while strategically omitting facts that would have shown misappropriation of Plaintiffs' trade secrets by the individual defendants:

   a.     Noah failed to return multiple USB drives containing files taken by Romo, thwarting Plaintiffs' ability to learn the full extent of Romo's misappropriation.

   b.     Noah failed to return an external hard drive used by Cardona to steal Plaintiffs' trade secrets, precluding Plaintiffs from assessing whether she deleted trade secret materials or withheld other trade secrets belonging to Plaintiffs.

   c.     Noah failed to return the USB drive on which Nip had saved Auris files.

   d.     Noah, through its law firm, falsely represented that no Auris trade secrets or confidential information had been used at Noah, when Noah knew it had already filed a

patent application based on Auris trade secrets. Indeed, that very same law firm filed the patent application on Noah's behalf.

Noah's CEO Zhang was copied on all of the communications to Auris from Noah's law firm that contained this pattern of misleading omissions. On information and belief, Zhang was aware of these failures to return key evidence and the false claim that Noah had not used Auris trade secrets.

16.    On information and belief, Noah and Romo have continued to use Plaintiffs' confidential information to advance the development of Noah's competing medical robotics technologies. For example, in June 2022 Noah filed patent application no. US 17/838,825 (the "June 2022 Noah Patent Application") that contains a figure depicting a catheter, which is indistinguishable from a figure in a confidential Auris presentation from February 2015 entitled "Hansen MicroCatheter," as shown below:



| Noah June 2022 Patent Application | Auris's "Hansen MicroCathater" Presentation from Feb. 2015 |

17.    Romo retained the Auris "Hansen MicroCatheter" presentation for nearly two years after his departure from Auris: he did not return that presentation to Auris until May 2022—although that presentation was marked "Auris Proprietary and Confidential," and Romo was contractually obligated to deliver it to Auris at the time his employment with Auris ended. On information and belief, Romo copied the figure from the 2015 Auris presentation into the June 2022 Noah Patent Application.

COMPLAINT

18.     When the June 2022 Noah Patent Application published on September 29, 2022, it publicly disclosed the figure depicted in Auris's presentation that Auris had kept confidential since at least February 2015.

19.     Plaintiffs' investigation into the full extent of Noah's and Noah employees' misappropriation from Plaintiffs is ongoing. In particular, Noah identified certain additional employees beyond the named defendants who formerly worked at Auris, retained Auris information, and have not returned that information. On information and belief, additional former Auris employees, named herein as Does One through Ten inclusive, also misappropriated Plaintiffs' trade secrets. Information regarding such misappropriation is in the exclusive control of Defendants and/or the control of Does One through Ten. Information regarding such misappropriation is readily ascertainable in discovery. Accordingly, the true names and capacities of Defendants Does One through Ten are unknown to Plaintiffs, and Plaintiffs will seek leave of court to amend this complaint to allege such names and capacities as soon as they are ascertained.

20.     Plaintiffs bring this action to obtain injunctive relief and damages from Noah. Against the individual defendants, Plaintiffs seek injunctive relief.

## **THE PARTIES**

21.     Plaintiff Auris is a corporation organized and existing under the laws of Delaware. Auris's headquarters and principal place of business is located at 150 Shoreline Drive, Redwood City, California.

22.     Plaintiff Verb is a corporation organized and existing under the laws of Delaware. Verb's headquarters and principal place of business is located at 5490 Great America Parkway, Santa Clara, California.

23.     Plaintiff Cilag is a limited liability company organized and existing under the laws of Switzerland. Cilag's headquarters and principal place of business is located in Switzerland.

24.     Defendant Noah is a corporation organized and existing under the laws of Delaware. Noah's headquarters and principal place of business is located at 1501 Industrial Road, San Carlos, California.

25.     On information and belief, Defendant Enrique Romo is an individual residing in Danville, California.[5]

26.     On information and belief, Defendant Diana Cardona is an individual residing in San Francisco, California. [6]

27.     On information and belief, Defendant Kenneth Nip is an individual residing in Redwood City, California.[7]

28.     Plaintiffs are ignorant of the true names or residences of the defendants sued herein under the fictitious names DOES ONE through TEN inclusive.

## JURISDICTION AND VENUE

29.     This Court has original jurisdiction over this action under the Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq*. and 28 U.S.C. § 1331. This Court has supplemental jurisdiction over related claims for relief under California law pursuant to 28 U.S.C. § 1367(a).

30.     Venue is proper in the Northern District of California under (a) 28 U.S.C. § 1391(b)(1), because all named defendants reside in this district and (b) 28 U.S.C. § 1391(b)(2), because a substantial part of the events or omissions giving rise to the claims alleged in this complaint occurred in this judicial district.

31.     The Court has personal jurisdiction over all named defendants because Noah's headquarters and principal place of business is in California and each of the remaining named defendants also reside in California. Additionally, the claims alleged by Plaintiffs in this complaint arise from illegal acts committed by each named defendant within California.

32.     Venue is proper at any courthouse in this district pursuant to Local Rule 3-2(c) and General Order No. 44(D)(3) because this is a case involving intellectual property rights.

[5] https://www.linkedin.com/in/enrique-romo-1887113/.
[6] https://www.linkedin.com/in/dianacardona/.
[7] https://www.linkedin.com/in/kennip/.

COMPLAINT

**FACTUAL BACKGROUND**

***Auris's Innovations in the Medical Robotics Space***

33.     Auris was founded in 2007 with the ambitious goal of revolutionizing medical intervention through robotics technology. Auris has been at the forefront of developing technologies for endoluminal robotic procedures, a complex technique that involves the introduction of flexible robotic devices into the body via natural openings to diagnose and/or treat medical conditions. Endoluminal procedures offer faster recovery times, because those procedures can be performed through the body's natural openings rather than relying solely on incisions. Thus, those procedures can be used on patients who are not strong enough to withstand invasive procedures that would involve incisions into the body.

34.     In 2016, Auris acquired Hansen Medical, a leader in developing robotics technology used to position and control catheters and related products. Auris acquired all of Hansen Medical's intellectual property; most Hansen employees, including Enrique Romo, joined Auris.

35.     Auris's Monarch Platform is the first flexible robotic platform cleared for use in both bronchoscopy (lung procedures) and urology (urinary tract procedures). As of 2021, doctors had performed more than 10,000 bronchoscopic procedures using the Monarch Platform.

36.     Ethicon, Inc., a subsidiary of J&J, acquired Auris in 2019.

37.     Verb was founded in 2015 as a joint venture between J&J and Verily Life Sciences (formerly Google Life Sciences). Verb worked on combining advanced visualization, advanced instrumentation, data analytics, and connectivity for operating room professionals. In early 2020, J&J acquired Verb and integrated Verb's talent and operations with Auris's, enhancing Auris's capacity for innovation.

38.     Cilag owns certain intellectual property relating to medical robotics technologies, products and processes, including trade secrets. Cilag funds research and development programs related to such products.

39.     In November 2020, Auris announced its intention to compete in the general surgery market with the OTTAVA™ System. The Ottava platform is perhaps Auris's most

COMPLAINT

ambitious project: it aims to have utility across a variety of surgical indications. Auris is actively developing the Ottava platform and expects to launch it upon regulatory approval.

40.     Due to the intense competition in the medical robotics space, Auris has limited its public disclosures regarding the Ottava platform.

### *Auris's, Verb's, and Cilag's Trade Secrets*

41.     Medical robotics is a highly specialized field that entails significant risks and demands detailed, specialized knowledge. To achieve and maintain its leadership in this field, Plaintiffs have invested significant time and resources to design, develop, and produce top-quality medical robotics technology. Plaintiffs have also purposefully maintained the secret nature of their technological developments given the increasingly competitive nature of the industry.

42.     Such commitment to leading-edge innovation in the service of customers and patients comes at a significant cost. Plaintiffs have invested millions of dollars annually to develop technologies, platforms, and products designed to optimize patient outcomes and advance medical science. Consequently, the protection of Plaintiffs' confidential, proprietary, and trade secret information, and the related goodwill, is vital to protect Plaintiffs' investments and to prevent competitors or would-be competitors from obtaining an unfair competitive advantage.

43.     Plaintiffs have expended significant time and effort developing robotic platforms to address various diseases, including by leveraging experience with bronchoscopy to extend platform capabilities to endoluminal procedures. Many of the components, mechanisms, testing data, and other learnings from Plaintiffs' research and development work are valuable to multiple medical applications and multiple robotic platforms used for diagnostic, therapeutic, and surgical procedures. Indeed, Plaintiffs have long sought to realize their goal of bringing to market medical robotics devices that can help patients and doctors across many applications. Knowledge of such learnings has economic value to competitors in the medical robotics market, including Noah.

44.     During the course of their product design and development, Plaintiffs further identified numerous potential solutions that they later abandoned, did not pursue, or elected to pursue at a later date for technical, commercial, and/or other practical considerations. Knowledge

COMPLAINT

1   of the solutions that Plaintiffs abandoned, considered but did not pursue, or elected to pursue later

2   has economic value to competitors in the medical robotics market, including Noah.

3          45.    At all relevant times, Plaintiffs have taken reasonable measures to maintain the

4   secrecy of their confidential information and trade secrets, including by instituting policies and

5   practices for protecting their information and physical assets.

6          46.    Plaintiffs protect their confidential information and trade secrets by, among other

7   things, requiring employees, as a condition of employment, to agree not to disclose confidential

8   information and to ensure the return of any such information at the termination of their

9   employment. Together, Plaintiffs' policies and employee agreements operate as measures that

10  maintain the secrecy of Plaintiffs' confidential information and trade secrets.

11         47.    Plaintiffs also protect their confidential information and trade secrets by storing

12  them in physically secure buildings with security guards where employees must sign in to access

13  such buildings. Employees must have a functioning key card, issued and authorized by the

14  respective Plaintiff, to gain access to that Plaintiff's offices. Employees must also visibly wear

15  identification badges at all times while on company premises. Further, employees must secure all

16  paper originals or copies that contain confidential information or trade secrets.

17         48.    Plaintiffs also protect confidential information and trade secrets stored

18  electronically by requiring users to have log-in names and associated passwords to access their

19  systems. Once logged in to Plaintiffs' computer systems, users are required to have additional

20  logins and passwords to gain access to software applications in which Plaintiffs store their

21  confidential information and trade secrets, including the software code and software requirements

22  for Auris's robotic platform.

23         49.    Plaintiffs also protect confidential information and trade secrets stored on

24  removable storage devices by requiring employees to ensure any such removable storage devices

25  are physically stored and secured in a company facility. If any backup contains confidential

26  information or trade secrets, Plaintiffs require that it must also be encrypted using company-

27  approved encryption. Further, Plaintiffs prohibit use of personal storage devices, including USB

28  and external hard drives, to store any confidential information or trade secrets.

COMPLAINT

50.     Plaintiffs' trade secrets at issue comprise the five categories described below, and all of the trade secret information described herein falls into one or more of these categories. The trade secret information in each of these categories derives independent economic value from not being generally known to, and not being readily ascertainable through proper means by, persons who can obtain economic value from the disclosure or use of those trade secrets.

51.     **Auris Endoscopic Trade Secrets.** Auris has developed a proprietary suite of innovations that relate to its endoscopic systems. Information about these innovations has substantial value to new and existing participants in the medical robotics space. Existing systems on the market are generally manual (non-robotic) or rigid, both comprising significant limitations. Manual operations require highly skilled and specialized surgeons, limiting access to treatment. And rigid robotic systems cannot access various regions of the patient anatomy (*e.g.*, colon) via a natural orifice and may require incisions on the patient's body (*e.g.*, abdomen) that increase trauma, procedure times, and recovery time. Auris's innovations enabling flexible robotic endoscopy facilitate positioning, tracking, and precise control of surgical instruments within the limited confines of human anatomy that are not possible with existing or publicly known designs.

52.     Auris's trade secrets related to its endoscopic systems comprise:

a.     Design details enabling enhanced control of the camera and other instruments of the endoscope through additional degrees of freedom;

b.     ███████████████████████████████████████████ ██████████ enabling enhanced range of motion;

c.     Design solutions to enhance visualization of the instruments, such as to keep them within the field of view of the camera;

d.     Test data and prototypes that result in greater efficiencies, cost savings, and/or enhanced performance; and

e.     Negative knowhow—that is, approaches that do not work and/or are sub-optimal—as to each of the above.

53.     **Instrument Manipulator Trade Secrets.** An instrument manipulator, the component at the end of the robotic arm that holds the instruments used in robotic procedures, is a

COMPLAINT

necessary component of all Auris's medical robots. Auris's instrument manipulators have complex designs and include multiple servo-motors that require highly sophisticated software and firmware to operate. Auris's instrument manipulators impart a significant advantage to its robots over Auris's competitors.

54.     Plaintiffs' trade secrets related to instrument manipulators comprise:

        a.      Design features, control mechanisms, and testing data reflecting the performance of Auris's instrument manipulators;

         b.      Source code related to testing and bring-up of motors used in Auris's instrument manipulators;

        c.       Negative knowhow—that is, approaches that do not work and/or are sub-optimal—as to each of the above.

55.     **Business and Manufacturing Trade Secrets.** Auris carefully considers and plans its research, development, and marketing timelines to optimize the time to market for its robotic platforms. In the competitive market of medical robotics, the first mover has a tremendous advantage due to the cost of medical robotic platforms and the time investment required for an operating physician to familiarize themself with a new robotic platform. Having a competitor's market plans, forecasts, and timelines would provide an immense advantage, and it would allow that player to tailor their research and development, marketing, and sales strategy to gain an unfair competitive advantage against the competitor. It could also enable targeted marketing distinguishing that player's products from the competitor's.

56.     Auris's Monarch Platform involves a unique bronchoscope design that allows surgeons to maneuver the small, constrained, and complicated anatomy of human lungs. Manufacturing an Auris bronchoscope is complex and costly. Accordingly, to maintain its competitive advantage, Auris has invested significant time and trial-and-error to develop a time-efficient and cost-effective layout of its manufacturing floor where manufacturing steps are performed in a specific order that results in high manufacturing output with an optimal level of staffing.

57.     Plaintiffs' trade secrets related to business and manufacturing include:

COMPLAINT

a.      Business and technical plans related to bringing a robotic platform to market;

b.      Program updates and timelines for development;

c.      Layouts and sequencing information used to manufacture Auris's bronchoscope and optimize the production timeline, such as floor plans and similar diagrams;

d.      Strategic information regarding capacity planning for bronchoscope production; and

e.      Negative knowhow—that is, approaches that do not work and/or are sub-optimal—as to each of the above.

58.      **CELS Trade Secrets.** A further aspect of Auris's research and development work has focused on enabling a robotic device to perform combined laparoscopic (i.e., a procedure that uses a laparoscope or laparoscopic instrument inserted through an incision in the body) and endoscopic (i.e., a procedure that uses an endoscope or endoscopic instrument inserted through the body's natural openings) methods, separately as well as simultaneously. When both methods are used simultaneously, the technology is sometimes also referred to as "CELS," which stands for "combined endoscopic laparoscopic surgery." CELS is a cutting edge robotic surgery technique that could open new frontiers in robotic surgery, because it combines the advantages of minimally invasive endoscopy with the enhanced capabilities of laparoscopy into a single, more capable platform. A CELS platform could be employed for multiple procedures and disease states. Auris's research and development relating to its CELS platform is highly confidential.

59.      Plaintiffs' trade secrets related to CELS comprise:

a.      Configuration and design details to enable CELS;

b.      Negative knowhow—that is, approaches that do not work and/or are sub-optimal—as to the above.

60.      **Other Design and Testing Trade Secrets.** Plaintiffs' medical robotics technologies incorporate the latest advancements in micro instrumentation, endoscope design,

sensing, and imaging technologies. Plaintiffs have spent years testing, collecting data, and refining aspects of their robotics technologies.

61.     Plaintiffs' trade secrets related to platform design and testing include:

        a.      Design and architecture details enabling manual control of the robotic arms;

        b.      ███████████████████████████████████████████████████ ████████ ;

        c.      Design requirements, specifications, and testing of platform instrumentation; and

        d.      Negative knowhow—that is, approaches that do not work and/or are sub-optimal—as to each of the above.

62.     Plaintiffs' confidential information identified above therefore constitutes trade secrets under the Defend Trade Secrets Act, because (1) Plaintiffs have taken reasonable measures to keep such information secret, and (2) such information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

### Noah's Competition with Auris

63.     Founded in 2018, Noah too develops medical robotics that target "treatment of patients across multiple disease states."[8] Noah's efforts are headed by two former Auris employees—Jian Zhang, Noah's founder and CEO; and Enrique Romo, Noah's VP of Research & Innovation.

64.     Noah's ambitions are derivative of Auris's. Noah has developed a robotic platform, called the Galaxy System; on information and belief, Noah anticipates FDA clearance for that system in 2023. This platform focuses on endoluminal bronchoscopic applications that appear to compete with Auris's Monarch Platform. Noah's marketing materials presently promote

---

[8] https://www.noahmed.com/.

the Galaxy System's small footprint and single-use disposable bronchoscope, among other features. Noah has made clear in public statements that it intends to pursue additional markets through products currently in development.[9]

65.   To date, Noah has hired over 20 former Auris employees, including sixteen engineers. On information and belief, former Auris employees comprise over 10% of Noah's total workforce.[10]

66.   Noah has expanded quickly. In March 2022, Noah opened two new facilities in this judicial district: a 10,000-square-foot research and training facility in Sunnyvale and a separate 15,000-square-foot research & development facility in San Carlos. Noah has stated it plans to use its new facilities to pursue new medical robotics indications.[11]

A.   **Enrique Romo and Noah's Use of Plaintiffs' Trade Secrets**

67.   Romo joined Auris in 2012. At the time of his departure from Auris in September 2019, he was Auris's Senior Director of Research and Innovation.

68.   As a condition of his employment, Romo signed an At-Will Employment, Confidential Information, Invention Assignment and Arbitration Agreement (the "Romo Agreement") on September 19, 2012 (**Exhibit A**). He agreed to, among other things, (a) "hold in strictest confidence, and not to use, except for the benefit of the Company, or to disclose. . . . any Confidential Information" of Plaintiffs; (b) "promptly make full written disclosure . . . and hereby assign" to Auris any inventions conceived during his employment; and (c) "assist [Auris] . . . in every proper way to secure [Auris's] rights in the Inventions," including expressly any patents or other intellectual property rights relating to the inventions. He also agreed, at the time of leaving Auris, to "deliver to the Company (and [] not keep in my possession, recreate or deliver to anyone else) any and all devices, records, data, notes, . . . [or] other documents or property." Romo breached those obligations.

---

[9] https://www.therobotreport.com/lessons-learned-in-medical-robotics-development/.
[10] https://www.linkedin.com/company/noahmed/.
[11] https://www.globenewswire.com/news-release/2022/03/09/2399883/0/en/Noah-Medical-Announces-New-Research-and-Training-Facilities-for-Next-Generation-Medical-Robotics-Platforms.html.

COMPLAINT

69.   The Romo Agreement expressly provides that either party may petition a court for injunctive relief to remedy a breach of the agreement.

70.   As leader of Auris's Research & Innovation team, Romo was intimately involved with Plaintiffs' most exciting and closely guarded innovations. His team was responsible for developing cutting edge technologies with a focus on flexible robotics solutions for various diseases.

71.   Romo led the Research & Innovation team that invented significant aspects of Auris's endoscopic systems. Primarily over the period from May to December in 2018, members of Romo's Research and Innovation team submitted a series of invention disclosures to the individuals entrusted with applying for patents on behalf of Auris. Romo was identified as a contributor and/or was copied on the submission for nearly all such invention disclosures. Invention disclosures are documents that are intended to describe the innovations that Auris's employees created during their work for the company. One such invention disclosure, submitted on May 4, 2018, by email, copying Romo and titled "Articulating Multi-Lumen Robotic Sheath" (the "May 2018 Auris Invention Disclosure") described inventions with distinct similarities to the robotic device disclosed by Noah and claimed in the Noah-Romo Provisional. To develop these inventions, Auris invested months or years of work and significant expense in creating prototypes and testing designs.

72.   Other novel innovations that this Auris team conceived included, for example, alternative designs for the "mother sheath," design features related to the camera, and other instruments used in the Auris endoscopic systems. At all relevant times, Auris maintained all of these innovations as trade secrets. These trade secrets would have value to competitors pursuing multiple applications.

73.   On information and belief, in the months before his departure from Auris, Romo took steps to prepare for performing the same role at Noah that he had played at Auris. Those steps included collecting Plaintiffs' trade secrets and confidential information so that he could use it at Noah.

COMPLAINT

74.     On June 16, 2019—three months before he left Auris—Romo sent to his personal Gmail account an email attaching a PowerPoint presentation titled "GI Imaging Modules_190614" (the "2019 Auris Imaging Presentation"). In that email, Romo wrote: "I proposed a high level chart that conveyed the major features of what is needed for imaging in the ESD project." The 2019 Auris Imaging Presentation depicts an endoscopic system developed by Romo's team:



75.     On July 21, 2019, Romo connected an external USB drive (a Kingston DataTraveler 3.0) to his Auris laptop. On information and belief, he copied a folder titled "Auris Meeting Info" to that external drive. That folder contained dozens of Plaintiffs' documents including presentations, engineering test and lab data, and workshop notes relating to the design, testing, and plans for Auris's endoscopic systems and instruments. One such presentation contained the image of an endoscopic system shown in the 2019 Auris Imaging Presentation. On information and belief, Romo accessed and gathered these materials to prepare for developing competing endoscopic systems at Noah.

76.     Romo resigned from his position at Auris in mid-August, 2019. His last day was September 18, 2019.

77.     One week before his last day, on September 11, 2019, Romo created a folder titled "pics for memories" on the desktop of his Auris laptop. On information and belief, Romo chose

COMPLAINT

this name to disguise his misappropriation. Rather than fill that folder with personal memories, Romo placed documents in that folder that were fundamentally at odds with a purported collection of personal memories. Romo placed in that folder extensive information related to his work at Auris, including, on information and belief, trade secret and confidential information about Auris's early demo on urology, endoluminal designs and flows, and videos and pictures of Auris's non-public product demos.

78.     On his last day, September 18, 2019, Romo again connected an external USB drive (a Kingston DataTraveler 2.0) to his Auris laptop. On information and belief, he copied the "Pics for memories" folder from his Auris drive to the external USB drive. On information and belief, these files would have informed and facilitated Romo's work as Noah's head of Research and Innovation.

79.     Although metadata reflecting these acts are still present on Romo's Auris laptop, the "pics for memories" folder and files contained within it are no longer present on that laptop. On information and belief, this is because Romo deleted those folders from his Auris-issued laptop sometime between September 17 and September 18, 2019—a period falling in his last 48 hours working for Auris.

80.     Romo also engaged in suspicious behavior using his personal iPhone: specifically, he took screenshots of dozens of his Auris emails. There was no legitimate reason for Romo to save those emails as screenshots—that is, in a less-convenient format than the native email then available to him. He took screenshots of the following trade secret and confidential information: (1) various weekly program updates, including detailed goals, key results, and timelines for completion of performance goals; (2) notes and key takeaways from a workspace analysis for a prototype of a robotic platform designed for CELS; (3) observations and analysis from a demo of an endoscopic procedure; and (4) a summary of key design decisions for the design of robotic arm controls and for sensor architecture. On information and belief, Romo took these screenshots with the intention of retaining the trade secret information contained therein after he left Auris— and no longer had access to his Auris email—so that he could use the trade secret information at Noah.

COMPLAINT

81.     Each of these screenshots depicts Plaintiffs' trade secrets in the design details, force sensing capabilities, and testing results of Plaintiffs' medical robotics technologies. Possessing these photographs could enable a competitor to replicate Auris's design features enabling manual arm control. Alternatively, a competitor could use these photographs to tailor its own marketing materials to address and distinguish the capabilities of Auris's product, giving them an advantage in the market for medical robotic platforms.

82.     Romo claimed to be taking a year-long "self-funded sabbatical" from work in the medical device sector beginning in September 2019. On LinkedIn, he described that period as a "break [to] tend to other important opportunities in life…….just for a year."



**CTO of self-funded Sabbatical…….**
Carpe Diem
Sep 2019 - May 2020 · 9 mos

After 20 years of non-stop adventures in the medical device sector with incredible colleagues and mentors, I have decided to take a break and tend to other important opportunities in life……just for a year.
I am looking forward to staying in touch with all of you.
Cheers!
-Enrique

83.     Nine months later, in May 2020, Romo joined Noah as VP of Research and Innovation.

84.     Some four weeks later—on June 2, 2020—Noah, through its law firm Wilson Sonsini Goodrich & Rosati ("WSGR"), filed the Noah-Romo Provisional. The Noah-Romo Provisional is attached hereto as **Exhibit B**. The Noah-Romo Provisional was not available for public inspection until December 2021.

85.     The disclosures in the Noah-Romo Provisional include trade secrets related to Auris endoscopy systems developed during Romo's tenure at Auris. In particular, depictions of the device claimed in the Noah-Romo Provisional bear a striking similarity to the device described in the May 2018 Auris Invention Disclosure submitted by Romo's team in an email copying Romo. The May 2018 Auris Invention Disclosure included an internal Auris

COMPLAINT



presentation. An image from the internal Auris presentation is shown below side-by-side with an

image from the Noah-Romo Patent Application:

| 2020 Noah-Romo Provisional | 2018 Auris Internal Presentation |
|---|---|

86.     The May 2018 Auris Invention Disclosure described details, features, and

advancements relevant to existing systems and Auris inventions related to endoscopic systems.

Subsequent invention disclosures dated October 3, December 21, and December 29, 2018 further

described embodiments and features of Auris's endoscopic systems. As detailed below, the Auris

inventions described in the 2018 Invention Disclosures closely resemble the designs and

inventions described in the Noah-Romo Provisional filed two years later:

| Systems and Features Described in Auris Invention Disclosures | Excerpts from Noah-Romo Provisional |
|---|---|
| | "The robotic platform may be configured to accommodate and manipulate the modular robotic system including a primary flexible articulating device (e.g., primary sheath) with multiple lumens which house a variety of flexible articulating surgical instruments." |
| | "The flexibility offered by the articulating arm of the endoscope instrument and the two flexible |

COMPLAINT



| | |
|---|---|
| | instruments may beneficially allow for the instruments to perform triangulation and converge on the area of interest. For instance, by orienting the camera on top and an instrument at each lower point of substantially a triangle creating a converging triad, the sight of the instruments and operating efficiency are maximized." |
| | "[T]he additional degrees of freedoms may allow the flexible instruments 320 and 330 to have triangulation by making the arms spread out or divert away from the base as they exit the distal portion of the primary sheath. The distal portions may then be steered back toward each other and utilized to apply capturing and/or compressive loads to a subject tissue structure . . ." |
| | "The imaging device 315 may be a camera for direct vision. The imaging device may be located at the distal tip of the articulating endoscope instrument 310." |

87.     Neither Romo nor Noah invented the system disclosed in the Noah-Romo Provisional; instead, it was invented at Auris, stolen by Romo, and used by Noah in the Noah-Romo Provisional. Romo knew, on or before June 1, 2020, that the Noah-Romo Provisional was based on Auris trade secrets.



89.      This is not the end of the misappropriation by Romo or, on information and belief, misappropriation by Noah through Romo. On September 13, 2021, Noah's law firm—the same firm that filed the Noah-Romo Provisional—represented that Romo **might** possess workplace-related photos and videos on his phones or in synched photo libraries. Noah's law firm neglected to mention that Romo retained **hundreds** of Plaintiffs' files, including detailed Word and PowerPoint documents, and that Romo had used high capacity external USB drives to copy Auris files before his departure.

90.      As to the files that Noah admitted Romo took, Noah's law firm proposed "prompt and secure and permanent deletion of any such items." Auris proposed that given the nature of the information in Romo's possession, an independent vendor should handle the return, remediation, and preservation of the information. Noah ignored Auris's proposals and embarked on its own process of "remediation" whereby Romo, with help from Noah's own vendor, purportedly self-identified Auris information for return to Auris.

91.      On May 20, 2022, Noah's law firm "returned" more than 700 files on behalf of Romo that Romo possessed in violation of his obligations to Auris. These included hundreds of photographs, emails, budgets, design documents, internal team updates, internal summaries and meeting notes, and other files containing valuable trade secrets belonging to Plaintiffs. Some of these documents were marked "Proprietary and Confidential." Romo's "returns" included the screenshots of emails and the Auris "Hansen MicroCatheter" presentation discussed above.

92.      When asked to explain the eight-month delay in providing Romo's "returns," Noah's law firm responded flippantly that "Romo simply came after the [many] others" at Noah who had retained Auris's information. Noah was apparently unperturbed that the high-ranking executive leading Noah's research and innovation team had access to a competitor's trade secret and confidential information for eight months during his tenure at Noah.

93.      Auris requested a forensically sound copy of Romo's returns that would have preserved information necessary to determine whether Auris files were disseminated or used at Noah. But Noah's law firm refused to provide such a copy. On information and belief, the May

COMPLAINT

20, 2022 returns did **not** include all of the files Romo copied to external hard drives on July 21, 2019 and September 18, 2019.

94.     On information and belief, as VP of Research and Innovation at Noah, Romo has a pivotal role in shaping Noah's strategy, process, and goals for its medical robotics development. He developed Noah's "four tenets of robotics innovation" that guides his teams at Noah,[12] and he helped drive Noah's recruitment of Auris's employees. On information and belief, he and Noah have used additional trade secrets belonging to Plaintiffs in Noah's business.

**B.     Diana Cardona**

95.     Defendant Cardona joined Auris in 2019. At the time of her departure from Auris in 2021, she was a Senior Robotics and Controls Engineer. She was responsible for a team developing an "advanced device manipulator" (ADM), which is an important component of the robotic arm in Auris's platforms.

96.     As a condition of her employment, on or about July 15, 2019 Cardona signed an Employee Secrecy, Intellectual Property and Non-Solicitation Agreement (the "Cardona Agreement"), attached hereto as **Exhibit C**. Cardona agreed to, among other things: (a) "not use or disclose any CONFIDENTIAL INFORMATION" of Plaintiffs; (b) "return all property in [her] possession or custody belonging to [Plaintiffs], including any CONFIDENTIAL INFORMATION" upon termination of her employment; and (c) "not make or retain copies of any CONFIDENTIAL INFORMATION or any correspondence, memoranda, reports, notebooks, drawings, photographs, purchasing or invoicing records, or other documents relating in any way to the business" of Plaintiffs. Cardona breached these obligations.

97.     On information and belief, Cardona began planning her departure from Auris no later than April 7, 2021 and began gathering Plaintiffs' trade secrets in furtherance of that plan. On that date, she emailed to her personal Gmail account a link to a Microsoft OneNote[13] file in Auris's cloud storage. That file was named, in part, "Diana @ Auris Surgical Robotics" (the

---

[12] https://www.therobotreport.com/lessons-learned-in-medical-robotics-development/.
[13] A Microsoft OneNote document is like a notebook with multiple tabs but in a digital format. A OneNote document can store text, images, and free form notes.

"Cardona OneNote File"). On information and belief, the Cardona OneNote File contained a collection of OneNote files that comprised Cardona's lab notebooks that she maintained to record her work at Auris. Those OneNote files contained hundreds of pages of confidential information belonging to Plaintiffs, including trade secrets.

98.     From April 2021 to when she left Auris to join Noah in August 2021, Cardona transferred Plaintiffs' confidential information and trade secrets from her Auris-issued laptop to her personal external hard drive multiple times. On April 16, 2021, Cardona copied files related to Auris's ADM to her external hard drive. The copied files contained datasheets for Auris's ADM, presentations describing how the ADM was designed and tuned, files for tuning the ADM, python scripts for reading the tuning files, and performance tests for the ADM. Cardona also copied files related to Plaintiffs' surgical instruments that are attached to the ADM and used with the Ottava platform. These files contained information about the CAD design, three dimensional movement, and performance of Plaintiffs' surgical instruments attached to the ADM. Further, Cardona copied files related to iPlatform, which was the internal name for Auris's Ottava platform. These files included design presentations, software, and firmware for the Ottava platform.

99.     Forensic evidence from Cardona's Auris-issued laptop also indicates that on April 16, 2021, she downloaded the following Microsoft OneNote file to an external drive: "Diana @ Auris Surgical Robotics.onepkg." A "onepkg" file is a collection of multiple OneNote files. On information and belief, the onepkg file that Cardona downloaded on April 16, 2021 was the packaged version of the Cardona OneNote File containing Plaintiffs' trade secrets for which she had emailed herself a link on April 7, 2021. On information and belief, Cardona downloaded that onepkg file to her personal external hard drive from the location of her OneNote lab notebooks in Auris's cloud storage.

100.     Forensic records from the Cardona's Auris-issued laptop indicate that later on April 16, 2021, Cardona downloaded the following Adobe Acrobat files to that same external drive: "ADM Beta.pdf," "ADM E.pdf," "ADM F.pdf," "ADM F Torque issues.pdf," "ADM F

Current Control.pdf," and "How To.pdf." These Acrobat files contained hundreds of pages of confidential information belonging to Plaintiffs, including trade secrets.

101.    On May 27, 2021, Cardona again sent to her personal Gmail account a link to access a OneNote document titled "Diana @ Auris Surgical Robotics." On information and belief, Cardona sent the link to the OneNote document to capture Plaintiffs' confidential and trade secret information that she had recorded in her lab notebook after her April 7, 2021 transmission of the Cardona OneNote File. That same day, forensic records from Cardona's Auris-issued laptop indicate that she accessed a file entitled "Resume – Diana Cardona 2021 Robotics.docx." On information and belief, the reference to "2021" further demonstrates that by May 27, 2021, Cardona was taking deliberate steps to depart from Auris.

102.    On information and belief, Cardona discussed employment with Noah at least by the latter half of July 2021. On information and belief, Cardona interviewed with Defendant Romo for a job at Noah on or about July 26, 2021.

103.    On information and belief, Cardona took additional steps to misappropriate Plaintiffs' trade secrets following that interview. Forensic evidence from Cardona's Auris-issued laptop demonstrates that on August 12, 2021, she again accessed and modified on her personal external hard drive a file named "Diana @ Auris Surgical Robotics.onepkg." On information and belief, Cardona modified the onepkg file to capture Plaintiffs' confidential and trade secret information that she had recorded in her lab notebook after she previously copied the onepkg file on April 16, 2021. She also downloaded a file named "ADM Beta cont.pdf." On information and belief, "ADM Beta cont.pdf" contained Plaintiffs' confidential and trade secret information that Cardona had added to her "ADM Beta" lab notebook after she misappropriated a copy of that notebook in April 2021, as described above. Cardona also copied to her personal external hard drive hundreds of additional documents related to Auris's ADMs and manual insertion of instruments in the Ottava platform. These files were in addition to the files that she copied in mid-April 2021. She also created two archive files—"19 Auris.zip" and "20 Auris.zip," which contained approximately one hundred photos and videos showing various components and

1   operations of Auris's robotic surgery products—and copied them to her personal external hard

2   drive.

3        104.   On August 24, 2021, Cardona ended her employment with Auris.

4        105.   On information and belief, in September 2021, Cardona joined Noah as a "R&I

5   Senior Robotics and Controls Engineer."

6        106.   Forensic evidence from Cardona's personal external hard drive shows that on

7   September 16, 2021, likely after Cardona had joined Noah, she accessed Plaintiffs' files that she

8   had copied to her personal external hard drive. The files she accessed included (a) the photos and

9   videos in the "Auris 19.zip" and "Auris 20.zip" archive files, (b) an internal file comparing an

10  Auris servo motor to a servo motor from █████████████████████████████████████████

11  █████, and (c) other confidential files related to ████████████████████████████████████

12  ███████████████████████████.

13       107.   On information and belief, on September 24, 2021, likely after Cardona joined

14  Noah, she accessed her online OneNote lab notebook multiple times using the link that she had

15  sent to her personal Gmail account.

16       108.   On February 18, 2022, WSGR purported to return to Auris materials Cardona

17  identified as originating from or belonging to Auris that she possessed on a personal hard drive.

18  The returned material demonstrates that Cardona transferred *hundreds* of Auris files from her

19  Auris-issued laptop to at least one personal external hard drive before her departure from Auris.

20  The files that Cardona transferred to her external hard drive contained detailed information about

21  the design, tuning, testing, software, firmware, and issues related to Auris's Ottava platform.

22  These files include Plaintiffs' trade secrets. For example, the stolen files contain technical

23  presentations and other documentation that describe Auris's architecture and device designs, key

24  parameters to ensure optimal performance, schematics, technical considerations underlying the

25  relevant designs, and a proprietary encoding protocol. The stolen files also summarize Auris's

26  internal strategy in product development, including but not limited to Auris's internal assessment

27  of key technical issues pending resolution, in-depth analysis underlying design choices,

28  development roadmap, and proposed division of labor among key technical divisions. The

COMPLAINT

misappropriated files also include spreadsheets that record confidential information relating to prototype testing, such as selection of relevant parameters, testing statistics, and graphic analysis.

109.   WSGR also confirmed that Cardona had accessed her personal external hard drive containing Plaintiffs' materials twice after leaving Auris, in September and November 2021. When asked by Auris's counsel to explain why Cardona had accessed these files, WSGR stated that Cardona represented that she had accessed the drive to "remind herself what was there, as she retained the files for personal, memorial reasons." This claim is not credible: as discussed above, Cardona undertook a deliberate, multi-step process to gather and steal Plaintiffs' trade secrets. On information and belief, she and Noah have used Plaintiffs' trade secrets in Noah's business.

**C.    Kenneth Nip**

110.   Kenneth Nip joined Auris in 2019 as a Manufacturing Sustaining Engineering Manager.

111.   As a condition of his employment, Nip signed an Employee Secrecy, Intellectual Property and Non-Solicitation Agreement (the "Nip Agreement") on July 4, 2019, attached hereto as **Exhibit D**. He agreed to, among other things: (a) "not use or disclose any CONFIDENTIAL INFORMATION, or provide any third party with access to any CONFIDENTIAL INFORMATION," unless authorized by Plaintiffs or required by law; (b) "return all property in [his] possession or custody belonging to [Plaintiffs], including any CONFIDENTIAL INFORMATION" upon termination of his employment; and (c) "not make or retain copies of any CONFIDENTIAL INFORMATION or any correspondence, memoranda, reports, notebooks, drawings, photographs, purchasing or invoicing records, or other documents relating in any way to the business" of Plaintiffs. Nip breached these obligations.

112.   Nip's primary role at Auris was in bronchoscope production. His responsibilities included line optimization and line balancing for the bronchoscope assembly line—tasks that are intended to make the production process effective and efficient. By necessity, he was intimately familiar with the design and process strategy for manufacturing Auris bronchoscopes.

113.   In May 2020, Nip joined Noah as a Senior Manufacturing Manager.

COMPLAINT

114.  On September 13, 2021, Noah informed Auris that Nip had retained documents or email "saved in the ordinary course." Noah admitted that Nip had an Auris "Excel spreadsheet relating to capacity planning." Noah made no reference to a USB drive on which Nip had Auris files.

115.  Eight months later, on May 16, 2022, Noah revealed that Mr. Nip had retained confidential Auris files on a USB drive and "returned" 14 such files to Auris. These files comprised trade secret and confidential Auris information related to capacity planning, manufacturing strategy, and optimization of line layouts. Such information would give a competitor a significant jump start in manufacturing a bronchoscope to compete with Auris's.

116.  On information and belief, Nip took those Auris files with him to use in developing an optimal layout and design for the production of Noah's potentially competing bronchoscope.

117.  WSGR's correspondence regarding Nip suggest that he used those Auris files in his work at Noah. In prior correspondence enclosing "returned" Auris information from other individuals, WSGR had consistently represented that the employee had "not uploaded, disseminated, or used files originating from J&J for his new employment with Noah Medical." WSGR made no such representation in its May 16, 2022 correspondence enclosing Nip's returns. On information and belief, WSGR omitted this representation because Noah knew or suspected that Nip had used the files he took from Auris for his work at Noah.

118.  On information and belief, Nip and Noah have used Plaintiffs' trade secrets in Noah's business.

**FIRST CAUSE OF ACTION**

**Violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq*. (Against All Defendants)**

119.  Plaintiffs incorporate the above paragraphs as though fully set forth herein.

120.  Plaintiffs own and possess certain trade secret material as alleged above.

121.  Plaintiffs' trade secret material relates to products and services used, sold, shipped, and ordered in, or intended to be used, sold, shipped and/or ordered in, interstate and/or foreign commerce.

COMPLAINT

122.    Plaintiffs have taken reasonable steps to protect the secrecy of their trade secret material, including all material that Plaintiffs have alleged in this complaint that Noah, Romo, Cardona, and/or Nip misappropriated.

123.    Plaintiffs' trade secret material derives independent economic value from not being generally known to, and not being readily ascertainable through proper means by, another person who could obtain economic value from the disclosure or use of the information.

124.    Plaintiffs' trade secret information was made available to Romo, Cardona, and Nip during their employment with Auris under circumstances requiring them to maintain the information in confidence.

125.    At all relevant times, Noah was aware that Romo, Cardona, and Nip had obligations to Plaintiffs to maintain the secrecy of, and limit the use of, Plaintiffs' trade secrets.

126.    Romo misappropriated trade secrets of one or more Plaintiffs by acquiring them in violation of his duty to Plaintiffs to maintain the secrecy of, and limit the use of, those trade secrets and by disclosing and using them in connection with the Noah-Romo Provisional in violation of that duty. On information and belief, Romo used other trade secrets belonging to one or more Plaintiffs referenced herein in his work for Noah.

127.    In misappropriating trade secrets of one or more Plaintiffs, Romo acted, at least in part, for the benefit of Noah. Noah asserts that it is the assignee of inventions disclosed in the Noah-Romo Provisional. Romo acted to benefit Noah by, on information and belief, executing an assignment purporting to assign Auris inventions to Noah. On information and belief, he used and disclosed other trade secrets of Plaintiffs while employed by Noah in furtherance of his work for Noah. Romo took Plaintiffs' trade secrets related to the development of endoscopic systems and systems capable of CELS, Research and Innovation program planning documents and budgets, sensor architecture, and designs for robotic arm controls. On information and belief, those trade secrets facilitated Romo's work for Noah in his role as Noah's Vice President of Research and Innovation.

128.    Cardona misappropriated trade secrets of one or more Plaintiffs by acquiring them in violation of her duty to Plaintiffs to maintain the secrecy of, and limit the use of, those trade

COMPLAINT

secrets and, on information and belief, by using and disclosing them at least in September 2021. On information and belief, Cardona used trade secrets of one or more Plaintiffs referenced herein in her work for Noah.

129.    In misappropriating Plaintiffs' trade secrets, Cardona acted at least in part for the benefit of Noah. On information and belief, she used and disclosed those trade secrets while employed by Noah in furtherance of her work for Noah. Cardona took Plaintiffs' trade secrets related to robotics and controls. On information and belief, those trade secrets facilitated Cardona's work for Noah in her role as an R&I Senior Robotics and Controls Engineer.

130.    Nip misappropriated trade secrets of one or more Plaintiffs by acquiring them in violation of his duty to Auris to maintain the secrecy of, and limit the use of, those trade secrets. On information and belief, Nip used trade secrets of one or more Plaintiffs referenced herein in his work for Noah.

131.    In misappropriating Plaintiffs' trade secrets, Nip acted, at least in part, for the benefit of Noah. Nip took trade secrets of one or more Plaintiffs related to manufacturing bronchoscopes. On information and belief, those trade secrets facilitated Nip's work for Noah in his role as a Senior Manufacturing Manager. On information and belief, that role involved managing the manufacturing of bronchoscopes. On information and belief, Noah was aware that Nip misappropriated trade secrets of one or more Plaintiffs for Noah's benefit, at least because on May 16, 2022, Noah "returned" Auris property in Nip's possession but failed to represent that Nip had not uploaded, disseminated, or used that information at Noah as Noah had done for other former Auris employees. On information and belief, Noah took no further action to ensure that Plaintiffs' trade secrets were not being used by Nip for his work at Noah.

132.    Noah misappropriated trade secrets of one or more Plaintiffs by disclosing and using those trade secrets in connection with the Noah-Romo Provisional without Auris's consent and with knowledge at that time that Noah's knowledge was derived from a person (Romo) who owed a duty to Plaintiffs to maintain the secrecy, and limit the use, of those trade secrets. On information and belief, Noah used other trade secrets of Plaintiffs referenced herein.

133.   On information and belief, Noah, Romo, Nip, and Cardona have failed to return to Plaintiffs all Plaintiffs' trade secret material within their possession, custody, or control. On information and belief, if Defendants are not enjoined, they will further misappropriate Plaintiffs' trade secret material by further disclosing and/or using the same.

134.   Defendants' misconduct constitutes misdeeds of a continuing nature for which Plaintiffs have no adequate remedy at law. Unless and until enjoined and restrained by order of this Court, Defendants will continue to retain and use Plaintiffs' trade secret material, and as a result, Plaintiffs will suffer severe and irreparable harm and damage. Under 18 U.S.C. § 1836(b)(3)(A), Plaintiffs are entitled to an injunction against the misappropriation and continued threatened misappropriation of trade secrets as alleged herein.

135.   Plaintiffs are entitled to recover from Noah the damages sustained as a result of the misappropriations alleged herein. The amount of such damages cannot be determined at this time but will be proven at trial. Plaintiffs are further entitled to recover from Noah the gains, profits, and advantages that it obtained as a result of the misappropriation alleged herein. Plaintiffs are currently unable to ascertain the full extent of these gains, profits, and advantages but will prove the value thereof at trial.

136.   Plaintiffs are also entitled to an award against Noah of exemplary damages, attorneys' fees, and investigative and litigation costs pursuant to 18 U.S.C. § 1836(b)(3)(B)–(D) because Noah's misappropriation was willful and malicious.

## SECOND CAUSE OF ACTION

### Breach of Written Contract (By Auris Against Romo)

137.   Plaintiffs incorporate all of the above paragraphs as though fully set forth herein.

138.   The Romo Agreement was a valid and existing contract at all times during and after Romo's employment by Auris and imposed binding contractual obligations on Romo at all relevant times.

139.   Auris performed all obligations required of it under the Romo Agreement.

140.   Pursuant to the terms of the Romo Agreement, Romo agreed to "hold in the strictest confidence, and not to use, except for the benefit of [Plaintiffs], or to disclose . . . without

COMPLAINT

written authorization" any confidential information of Plaintiffs. He agreed that "at the time of

leaving the employ of [Auris], I will deliver to [Auris] (and will not keep in my possession,

recreate or deliver to anyone else) any and all devices, records, data, notes, reports, proposals,

lists, correspondence, specifications, drawings, blueprints, sketches, materials, equipment, other

documents or property, or reproductions of any aforementioned items developed by me pursuant

to my employment with [Auris] or otherwise belonging to" Plaintiffs. He agreed to "hereby

assign to [Auris] all right, title and interest in and to any and all inventions" he solely or jointly

developed while employed by Auris. Further, Romo was, and continues to be, obligated to assist

Auris in "every proper way to secure the Company's rights in the Inventions and any copyrights,

patents, mask work rights or other intellectual property rights relating thereto in any and all

countries, including, without limitation, the disclosure to the Company of all pertinent

information and data respect thereto, the execution of all applications, specifications, oaths,

assignments and all other instruments which the Company shall deem necessary in order to apply

for and obtain such rights."

141.    Romo breached the Romo Agreement when he disclosed confidential Auris

documents without Auris's authorization by, on June 16, 2019, emailing to his personal Gmail

account the 2019 Auris Imaging Presentation. Romo further breached the Romo Agreement by

(a) failing to hold in confidence, and disclosing without written authorization, confidential

information belonging to Plaintiffs; (b) failing to deliver to Auris at the time he left his

employment with Auris all devices, records, data, notes, reports, proposals, lists, correspondence,

specifications, drawings, blueprints, sketches, materials, equipment and other documents or

property, or reproductions of the same; (c) repudiating and/or violating the terms of his

assignment to Auris all rights, title, and interest in inventions he solely or jointly developed when

employed at Auris; and (d) failing to assist Auris in securing intellectual property rights,

including patent rights, in inventions for which Romo invented or co-invented while at Auris by

assisting Noah in securing patent rights in those same inventions.

142.    The Noah-Romo Provisional claims patent rights to a robotic system that

comprises features identical or nearly identical to Auris's endoscopic systems, including as

described in Auris invention disclosures spanning May-December of 2018. At least those robotic system features were invented or developed at Auris.

143.   As a direct and proximate result of Romo's ongoing breaches, Auris has suffered and will continue to suffer harm. Romo's breaches make it more difficult for Auris to secure intellectual property rights: Romo's failure to assist Auris in protecting its confidential information from disclosure, securing patent rights, and Romo's actions that instead help Noah claim ownership of Auris's inventions, impede Auris's ability to protect its innovations. The harm caused by Romo's conduct will be difficult to quantify as monetary damages, leaving Auris without an adequate remedy at law.

144.   As a result, Plaintiffs are entitled to an injunction requiring specific performance by Romo of the Romo Agreement and restraining further breaches of the same. In particular, Plaintiffs are entitled to an injunction (a) requiring Romo to return to Plaintiffs all of Plaintiffs' property in his possession, including all written records of inventions made by Romo during the term of his employment with Auris, and (b) restraining him from using Plaintiffs' confidential information in his employment at Noah. Auris is also entitled to an injunction requiring Romo's full assistance in securing Auris's rights in Romo's inventions related to Auris's endoscopic systems and any other inventions Romo invented or co-invented while employed by Auris. Such assistance includes, without limitation, Romo's cooperation in securing all Auris's rights to (a) all Auris information and trade secrets contained in the Noah-Romo Provisional and other patent applications by Noah that contain the same and (b) all Auris inventions described in the Noah-Romo Provisional and any other Noah patent applications, including by assigning control of the prosecution of those patent applications to Auris, by correcting inventorship on the applications to Auris's inventors, and/or by assignment of the applications to Auris through filings with the USPTO and other international and national patent offices.

### THIRD CAUSE OF ACTION

**Tortious Interference with Contract (By Auris Against Noah)**

145.   Plaintiffs incorporate all of the above paragraphs as though fully set forth herein.

146. Defendant Romo was a party to a binding contract with Auris: the Romo Agreement.

147. Because he was then employed at Auris when Romo was hired by Auris, Noah's CEO Jian Zhang knew, on information and belief, that Romo executed the Romo Agreement. Noah therefore knew that Romo was bound by the terms of that agreement, that he was required to assign to Auris any inventions he created, in whole or in part, during his employment at Auris, and that he was required to assist Auris in obtaining patent protection for such inventions.

148. On information and belief, Noah knew that the inventions described in the Noah-Romo Provisional were not developed by Romo at Noah; Romo did not develop those inventions in the few weeks after he commenced work for Noah and before the Noah-Romo Provisional application was prepared and filed with the USPTO.

149. Noah interfered with Romo's contract knowingly and with the intent to cause him to breach his agreement with Auris. Noah knew that filing a patent application claiming Auris's innovations as an invention of Noah would be certain to disrupt Romo's contractual relationship with Auris by (a) violating the terms of Romo's assignment to Auris and (b) preventing Romo from assisting Auris in securing patent rights in that invention.

150. Romo did breach his obligations under his assignment agreement with Auris, at least by claiming his innovations related to Auris's endoscopic systems as inventions belonging to Noah and referenced in the Noah-Romo Provisional.

151. Auris was harmed by Noah's conduct. These acts by Noah have caused and will continue to cause Auris to suffer economic damages proximately caused by the intentional interference, including but not limited to the disruption of Auris's operations and unjust enrichment gained by Noah.

152. These acts by Noah also have caused and, unless enjoined, will continue to cause irreparable damage to Auris, including but not limited to loss of competitive advantage, for which Auris has no adequate remedy at law.

COMPLAINT

153.    Each of the acts of interference was done willfully and maliciously by Noah, with the deliberate intent to injure Auris's business and improve its own business and for financial gain, thereby entitling Auris to punitive damages and/or attorneys' fees to be proven at trial.

**FOURTH CAUSE OF ACTION**

**Breach of Written Contract (By Auris Against Cardona)**

154.    Plaintiffs incorporate all of the above paragraphs as though fully set forth herein.

155.    The Cardona Agreement was a valid and existing contract at all times during and after Cardona's employment by Auris and imposed binding contractual obligations on Cardona at all relevant times.

156.    Auris performed all obligations required of it under the Cardona Agreement.

157.    Pursuant to the terms of the Cardona Agreement, Cardona agreed that, except in the course of her job responsibilities for Auris, she would "not use or disclose any CONFIDENTIAL INFORMATION" of Plaintiffs "or provide any third party with access to any CONFIDENTIAL INFORMATION" of Plaintiffs. Cardona also agreed that, upon termination of her employment with Auris, she would "return all property in [her] possession or custody belonging to [Plaintiffs], including any CONFIDENTIAL INFORMATION." Further, Cardona agreed to "not make or retain copies of any CONFIDENTIAL INFORMATION or any correspondence, memoranda, reports, notebooks, drawings, photographs, purchasing or invoicing records, or other documents relating in any way to the business" of Plaintiffs.

158.    Cardona breached the Cardona Agreement when she used or disclosed outsider her job responsibilities Plaintiffs' CONFIDENTIAL INFORMATION without Plaintiffs' authorization by, on April 7 and May 27, 2021, emailing to her personal Gmail account the Cardona OneNote File. She further breached the Cardona Agreement by, on August 12, 2021, making and retaining copies of Plaintiffs' files by connecting her WD My Passport 2626 external hard drive to her Auris computer and transferring confidential Plaintiffs' files to that hard drive. She breached the Cardona Agreement, by, on September 24, 2021, accessing the Cardona OneNote File online after her employment with Auris ended using the link that she had sent to her personal Gmail account on April 7 and/or May 27, 2021. Cardona further breached the Cardona

1    Agreement when, at the time her employment with Auris ended, she failed to return to Plaintiffs

2    all property in her possession or custody belonging to Plaintiffs, including CONFIDENTIAL

3    INFORMATION.

4        159.   As a direct and proximate result of Cardona's ongoing breaches, Plaintiffs have

5    suffered and will continue to suffer harm. Cardona's breaches make it more difficult for Plaintiffs

6    to secure their CONFIDENTIAL INFORMATION.

7        160.   The harm caused by Cardona's conduct will be difficult to quantify as monetary

8    damages, leaving Plaintiffs without an adequate remedy at law. As a result, Plaintiffs are entitled

9    to an injunction requiring specific performance by Cardona of the Cardona Agreement and

10   restraining further breaches of the same. In particular, Plaintiffs are entitled to an injunction

11   requiring Cardona to return all Plaintiffs' property in her possession and restraining her from

12   using Plaintiffs' CONFIDENTIAL INFORMATION in her employment at Noah.

13   **FIFTH CAUSE OF ACTION**

14   **Breach of Written Contract (By Auris Against Nip)**

15       161.   Plaintiffs incorporate all of the above paragraphs as though fully set herein.

16       162.   The Nip Agreement was a valid and existing contract at all times during and after

17   Nip's employment by Auris and imposed binding contractual obligations on Nip at all relevant

18   times.

19       163.   Auris performed all obligations required of it under the Nip Agreement.

20       164.   Pursuant to the terms of the Nip Agreement, Nip agreed that, except in the course

21   of his job responsibilities for Auris, he would "not use or disclose any CONFIDENTIAL

22   INFORMATION" of Plaintiffs. Nip also agreed that, upon termination of his employment with

23   Auris, he would "return all property in [his] possession or custody belonging to [Plaintiffs],

24   including any CONFIDENTIAL INFORMATION." Further, Nip agreed to "not make or retain

25   copies of any CONFIDENTIAL INFORMATION or any correspondence, memoranda, reports,

26   notebooks, drawings, photographs, purchasing or invoicing records, or other documents relating

27   in any way to the business" of Plaintiffs.

28

165.    Nip breached the Nip Agreement when, at the time his employment with Auris ended, he failed to return to Auris all property in his possession or custody belonging to Auris, including CONFIDENTIAL INFORMATION. Nip further breached the Nip Agreement when, on information and belief, he used or disclosed in his work for Noah Auris CONFIDENTIAL INFORMATION related to capacity planning, manufacturing strategy, and optimization of manufacturing line layouts.

166.    As a direct and proximate result of Nip's ongoing breaches, Auris has suffered and will continue to suffer harm. Nip's breaches make it more difficult for Auris to secure its CONFIDENTIAL INFORMATION.

167.    The harm caused by Nip's conduct will be difficult to quantify as monetary damages, leaving Plaintiffs without an adequate remedy at law. As a result, Plaintiffs are entitled to an injunction requiring specific performance by Nip of the Nip Agreement and restraining further breaches of the same. In particular, Plaintiffs are entitled to an injunction requiring Nip to return all Auris property in his possession and restrain him from using Auris's CONFIDENTIAL INFORMATION in his employment at Noah.

## **SIXTH CAUSE OF ACTION**

**California Statutory Unfair Competition (Cal. Bus. & Prof. Code § 17200) (By Auris Against Noah)**

168.    Plaintiffs incorporate all of the above paragraphs as though fully set herein.

169.    Romo was contractually obligated to assign all inventions to Auris that he solely or jointly developed while employed at Auris. Noah interfered with this obligation by filing a patent application claiming Auris's innovations as Noah's inventions.

170.    Noah interfered with Romo's contractual obligations to Auris for the purpose of benefitting from Auris's innovations.

171.    Noah's actions as alleged herein constitute unfair competition within the meaning of California Business and Professional Code §§ 17200 *et seq.*, causing actual and irreparable injury to Auris.

COMPLAINT

172.    As a direct result of Noah's acts of unfair competition described herein, Auris has suffered injury in fact and has lost property (at least in the form of lost goodwill) within the meaning of California Business and Professions Code § 17204.

173.    Pursuant to California Business and Professions Code § 17203, Auris is entitled to permanent injunctive relief, whereby Noah is ordered to cease its unfair competition as described herein.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request the following relief:

As against all Defendants:

A.  Injunctive relief prohibiting misappropriation, and requiring return, of all Plaintiffs' trade secrets;

As against Defendant Noah:

Judgment in Plaintiffs' favor and against Noah on causes of action one, three, and six for:

A.  Further injunctive relief prohibiting interference with Romo's contractual obligations to Auris;

B.  Damages in an amount to be further proven at trial;

C.  Investigative and litigation costs;

D.  Punitive and exemplary damages;

E.  Restitution;

F.  Attorneys' fees and costs;

G.  Prejudgment interest; and

H.  Such other and further relief as the Court may deem to be just and proper.

As against Defendant Romo:

Judgment in Plaintiffs' favor and against Romo on causes of action one and two alleged herein for:

A.  An injunction requiring specific performance of Romo's obligations under the Romo Agreement to (1) return all Plaintiffs' property in his possession, including all written

COMPLAINT

records of inventions made by him during the term of his Auris employment and (2) require Romo's full assistance in securing Auris's rights in Romo's inventions related to Auris's endoscopic systems and any other inventions Romo invented or co-invented while employed by Auris. Such assistance includes, without limitation, Romo's cooperation in securing all Auris's rights to (1) all Auris information and trade secrets contained in the Noah-Romo Provisional and other patent applications by Noah that contain the same and (2) all Auris inventions described in the Noah-Romo Provisional and any other Noah patent applications, including by assigning control of the prosecution of those patent applications to Auris, by correcting inventorship on the applications to Auris's inventors, and/or by assignment of the applications to Auris through filings with the U.S. Patent and Trademark Office and other international and national patent offices;

B. Further injunctive relief against disclosure or use of Plaintiffs' confidential information; and

C. Such other and further relief as the Court may deem to be just and proper.

As against Defendant Cardona:

Judgment in Plaintiffs' favor and against Cardona on causes of action one and four alleged herein for:

A. An injunction requiring specific performance of Cardona's obligations under the Cardona Agreement to assist Plaintiffs to return all Plaintiffs' property in her possession;

B. Further injunctive relief against disclosure or use of Plaintiffs' CONFIDENTIAL INFORMATION; and

C. Such other and further relief as the Court may deem to be just and proper.

As against Defendant Nip:

Judgment in Plaintiffs' favor and against Nip on causes of action one and five alleged herein for:

COMPLAINT

1  A. An injunction requiring specific performance of Nip's obligations under the Nip

2    Agreement to return all Plaintiffs' property in his possession;

3  B. Further injunctive relief against disclosure or use of Plaintiffs' CONFIDENTIAL

4    INFORMATION; and

5  C. Such other and further relief as the Court may deem to be just and proper.

6            **<u>JURY DEMAND</u>**

7  Auris demands a jury trial for all issues so triable.

8

9

  Dated: December 12, 2022      O'MELVENY & MYERS LLP

10

11

            By: /s/ *David R. Eberhart*

12             David R. Eberhart

             Saurabh Prabhakar

13             Kaitlyn Gosewehr

             Rui Li

14

15             Attorneys for Plaintiffs

             AURIS HEALTH, INC., VERB

16             SURGICAL INC., and CILAG GMBH

             INTERNATIONAL

17

18

19

20

21

22

23

24

25

26

27

28

           COMPLAINT