**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| AURIS HEALTH, INC., VERB SURGICAL INC., and CILAG GMBH INTERNATIONAL, | Case Number:  3:22-cv-08073-AMO (LJC) |
| Plaintiffs, | STIPULATED ORDER RE: DISCOVERY OF ELECTRONICALLY STORED INFORMATION |
| vs. | |
| NOAH MEDICAL CORPORATION, ENRIQUE ROMO, DIANA CARDONA UJUETA, KENNETH NIP, LEOBARDO CENTENO CONTRERAS, MOUSLIM TATARKHANOV, MAZIYAR KESHTGAR, SARIKA PANDHARE, and DOES ONE through TEN inclusive, | |
| Defendants. | |

## 1.  PURPOSE

This Order will govern discovery of electronically stored information ("ESI") in this case as a supplement to the Federal Rules of Civil Procedure, this Court's Guidelines for the Discovery of Electronically Stored Information, and any other applicable orders and rules.

## 2.  COOPERATION

The parties are aware of the importance the Court places on cooperation and commit to cooperate in good faith throughout the matter consistent with this Court's Guidelines for the Discovery of ESI.

## 3.  LIAISON

The parties have identified liaisons to each other who are and will be knowledgeable

about and responsible for discussing their respective ESI.  Each e-discovery liaison will be, or have access to those who are, knowledgeable about the technical aspects of e-discovery, including the location, nature, accessibility, format, collection, search methodologies, and production of ESI in this matter. The parties will rely on the liaisons, as needed, to confer about ESI and to help resolve disputes without court intervention.

## 4. PRESERVATION

The parties have discussed their preservation obligations and needs and agree that preservation of potentially relevant ESI will be reasonable and proportionate. To reduce the costs and burdens of preservation and to ensure proper ESI is preserved, the parties agree that:

a) Only ESI created, added, copied, modified, transferred, or received between 6/1/2019 and 12/12/2023 will be preserved;

b) The parties have exchanged a list of the types of ESI they believe should be preserved and the custodians, or general job titles or descriptions of custodians, for whom they believe ESI should be preserved, e.g., "HR head," "scientist," and "marketing manager." The parties shall add or remove custodians as reasonably necessary;

c) The parties agree to negotiate a reasonable number of custodians per party for whom ESI will be preserved;

d) These data sources are not reasonably accessible because of undue burden or cost pursuant to Fed. R. Civ. P. 26(b)(2)(B) and ESI from these sources will be preserved but not searched, reviewed, or produced: none;

e) Among the sources of data the parties agree are not reasonably accessible, the parties agree not to preserve the following:

- ESI deleted in the normal course of business before the time a preservation obligation in this matter came into effect;

- Backup data files that are maintained in the normal course of business for purposes of disaster recovery, including (but not limited to) backup tapes, disks, SAN, and other forms of media, and that are substantially duplicative

of data more accessible elsewhere;

- Deleted, "slack," fragmented, or unallocated data only accessible by forensics;

- Random access memory (RAM), temporary files, or other ephemeral data that are difficult to preserve without disabling the operating system;

- On-line access data such as (without limitation) temporary internet files, history files, cache files, and cookies;

- Data in metadata fields frequently updated automatically, such as last-opened or last-printed dates;

- Electronic data (e.g., call logs, email, calendars, contact data, notes, etc.) sent to or from mobile devices (e.g., iPhone, iPad, Android, and Blackberry devices), if a copy of such electronic data is routinely saved elsewhere (such as on a server, laptop, desktop computer, or "cloud" storage);

- Voicemail, including Telephone or VOIP voice messages;

- Data remaining from systems no longer in use that is unintelligible on the systems in use;

- Electronic data temporarily stored by laboratory equipment or attached electronic equipment, provided that such data is not ordinarily preserved as part of a laboratory report;

- Software files included on the National Institute of Standards and Technology (NIST) Modern RDS (minimal) list obtained from https://www.nist.gov/itl/ssd/software-quality-group/national-software-reference-library-nsrl/nsrl-download/current-rds;

- Structural files not material to individual file contents (e.g., .CSS, .XSL, .XML, .DTD, etc.);

- Operating System files that do not store user-created content (e.g., CAT, DLL, DMP, EXE, FON, PNF, OPS, SYS, etc.);

- Application source code, configuration, and other similar files necessary for the function of an application that do not store user-created content during ordinary use (e.g., BAK, BIN, CFG, DBF, DAT, JS, JSON, JAR, LUA, MSB, RES, WINNT, YTR, etc.).

f) <u>Disaster-Recovery Backup Data</u>. Consistent with the proportionality standard, and absent a Party's specific written notice for good cause, no Party shall be required to modify or suspend procedures, including rotation of backup media, used in the normal course of business to back up data and systems for disaster recovery purposes. Absent a showing of good cause, such backup media shall be considered to be not reasonably accessible.

g) The parties agree that if a party seeks from an individual a forensic image of a device or account that contains that personal health information or personally-identifiable information of that individual or their family, the parties will negotiate and agree on search terms, which will then be run by a neutral third-party vendor, at both parties' expense as set forth in Attachment B, Forensic Inspection Protocol Agreement. To the extent the parties fail to reach agreement on search terms, they may present that dispute to the Court using the applicable discovery resolution procedures. Nothing in this paragraph shall relieve any party of its obligation to search for responsive material in its possession, custody, or control.

**5. SEARCH**

The parties agree that in responding to an initial Fed. R. Civ. P. 34 request, or earlier if appropriate, to contain costs in the identification of relevant ESI for review and production, the Parties will make reasonable efforts to meet and confer to discuss the use of reasonable search filters such as word/phrase filters, proximity filters, or date filters, among other possible filters. For example, the parties agree to negotiate a reasonable number of search terms for this matter.

In any such discussion,

a) After the Producing Party has first disclosed its search filters, and only if any other

party believes in good faith that use of the disclosed search filters would result in deficiencies in production, the Parties will make reasonable efforts to meet and confer on revisions to such filters, on the understanding that this may be an iterative process. Any proposed search filters shall be narrowly tailored to particular claims and defenses.

b) Nothing in this order shall be deemed to be a waiver of any right or responsibility of the Producing Party to manage and control searches of its data files, including the right, upon notice to the Receiving Party, to make good-faith revisions to search filters.

The fact that any electronic file has been identified in agreed-upon searches shall not prevent any Party from withholding such file from production on the grounds that the file is not responsive, that it is protected from disclosure by applicable privilege or immunity, that it is governed by any applicable privacy law or regulation, that it contains commercially sensitive or proprietary non-responsive information, or that the Protective Order entered in this Action allows the file to be withheld.

Nothing in this section shall limit a Party's right reasonably to seek agreement from the other Parties or a court ruling to modify previously agreed-upon search filters.

## 6.  PRODUCTION FORMATS

The parties agree to produce documents in ☐ PDF, ☒TIFF, ☒native and/or ☒paper or a combination thereof (check all that apply) file formats as detailed below. If particular documents warrant a different format, the parties will cooperate to arrange for the mutually acceptable production of such documents. The parties agree not to degrade the searchability of documents as part of the document production process.

a) Production in Reasonably Usable Form.

i.  The parties shall produce electronically stored information in reasonably usable form. Except as stated in Paragraphs 6.b and 6.c below or as agreed hereafter by the parties, such reasonably usable form shall be the single-page TIFF-image format with

extracted or OCR text and associated metadata set out in Attachment A, which is incorporated in full in this protocol ("TIFF-*Plus* format"). If the Receiving Party, for good cause explained in the request and subject to the proportionality standard, seeks production in native format of specifically identified ESI produced originally in TIFF-*Plus* format, the Producing Party shall respond reasonably and in good faith to any such request. Procedures for production of a native file in response to any such request are set out in Paragraph 6.b.

ii. Each Party may make requests, for good cause and subject to the proportionality standard, for production of specifically identified documents in color.

b) <u>Native Files</u>. Discoverable portions of electronic spreadsheets (e.g., Excel), electronic presentations (e.g., PowerPoint), word processing files with tracked changes, comments, or hidden text (e.g., Word), desktop databases (e.g., Access), and audio/video multimedia files shall be produced in native format as in Paragraph A.14.a of Attachment A.

c) <u>Enterprise Databases, Database Management Systems, and Other Structured Data ("Structured Data Systems").</u>

i. If discoverable data from any Structured Data System can be produced in an already existing and reasonably available report, the Producing Party may collect and produce the data in that report format in accordance with Paragraph 6.a;

ii. If an existing report form is not reasonably available, the Producing Party may make reasonable efforts to export from the Structured Data System discoverable information in a format compatible with Microsoft Excel or Microsoft Access and may produce such information in that native format.

d) <u>Documents That Exist Only In Hardcopy (Paper) Form</u>

A Party may produce documents that exist in the normal course of business only in hardcopy form either (a) in their original hardcopy form or (b) scanned and produced in accordance with the procedures set out in Attachment A. The scanning of original hardcopy documents does not otherwise require that the scanned images be treated as ESI

e) Email Threading

    i.  Email threads are email communications that contain non-inclusive email communications that also may exist separately in the Party's electronic document collection. An inclusive email is one that contains unique content and all the non-inclusive email text, including attachments, for that branch of the email thread. The Parties agree that removal of available non-inclusive emails from potential production will reduce all Parties' costs of document review, production, and litigation-support hosting, and, when producing the inclusive email of a thread, the parties need not produce any non-inclusive emails from the same thread.

    ii.  Participants in non-inclusive emails that otherwise would have been subject to review shall be listed in the most-inclusive email's "ALL_PARTICIPANTS" field included in the data load file (see Attachment A, ¶ 13.c). Following production of inclusive emails, for good cause and subject to the proportionality standard, a Receiving Party may make reasonable requests for individual non-inclusive emails. The Producing Party shall cooperate reasonably in responding to any such requests if the requested non-inclusive emails otherwise would have been subject to production.

f) Avoidance of Duplicate Production

    i.  "Duplicate ESI" means files that are exact duplicates based on the files' MD5 hash, SHA-1 hash, email duplicate spare messages (as defined by Relativity) or SHA-256 hash values. The Producing Party need produce only a single copy of responsive Duplicate ESI. A Producing Party shall take reasonable steps to de-duplicate ESI globally (i.e., both within a particular custodian's files and across all custodians). Entire document families may constitute Duplicate ESI. De-duplication shall not break apart families. When the same Duplicate ESI exists in the files of multiple custodians, all custodians who own a duplicate version of the original document family or top level document shall be listed in the CUSTODIANSALL field identified in Paragraph A.13(c) of Attachment A.

7

ii.    If the Producing Party makes supplemental productions following an initial production, that Party also shall provide with each supplemental production an overlay file to allow the Receiving Party to update the CUSTODIANSALL field. The overlay file shall include both all custodians listed in the CUSTODIANSALL field in prior productions and any custodians newly identified in the current supplemental production.

## 7.    DATA SECURITY

Parties (i) shall not permit or enable unauthorized dissemination and/or sharing in any manner of Protected Material (as defined in the "Stipulated Protective Order") in any manner not permitted by this Stipulation and Order; (ii) shall take all necessary and prudent measures, including the industry-standard procedures set out immediately below in subparagraph (a), to preserve the security of Protected Material by protecting against unauthorized breaches of systems on which Protected Material is stored or through which it is transmitted; and (iii) shall store, maintain, and transmit Protected Material solely within the United States.

Parties shall employ continually at least the following industry-standard data-security practices:

a) **Encryption** of Protected Material "at rest" (i.e., in every location in which it is stored) and "in transit" (i.e., whenever it is communicated in manners authorized under this Order between parties, or between a Party or its counsel and any vendor(s), expert witness, or other third party retained to assist such Party or its counsel in this Action).

b) **Access Controls**:

(1) **Role-based Access Controls** that use criteria (a) limiting access to Confidential Material to only those who need to know and (b) prohibiting access to all others.

(2) **Password Security** requiring "strong" passwords as the term "strong" is understood in the data-security industry.

(3) **Multi-factor Authentication** for remote access to Protected Material and for administrative access to systems that process or store Protected Material.

c) **Malware Protection** comprising industry-standard spam filters, anti-virus and anti-spyware software (including email URL and attachment scanning), firewalls, email encryption services, network security protocols, intrusion detection systems, and data loss prevention solutions.

d) **Asset Management** of current and historical inventories of hardware and software used to receive, store, manage, and transmit Protected Material.

e) **Cyber and privacy liability insurance**.

The following requirements apply in the event that unauthorized access to or acquisition of Protected Material (other than a Party's own Protected Material) is reasonably likely to have occurred (a "Breach"):

i. A Receiving Party (as defined in the Stipulated Protective Order) who knows of the Breach shall take immediate necessary and prudent remedial measures, including measures in compliance with state and regulatory requirements, to prevent reoccurrence of a Breach and promptly shall inform the Designating Party of all facts relating to the Breach, including identification of all Protected Material that may have been accessed or acquired in the Breach, and of all remedial measures taken in response to the Breach.

ii. Receiving Party who suffered the Breach also shall have available for any inspection requested by the Court all of the following industry-standard plans or protocols used or adopted by the Receiving Party prior to the Breach:

(1) **Policies and Procedures**.  I.e., all components of any written information-security policy, procedure, plan, program, or cyber and privacy liability insurance.

(2) **Assessments and Audits**.  I.e., any security and risk assessment, penetration test, vulnerability scan, or other analysis of the security of the person's network and data systems.

(3) **Certifications**.  Any certification of compliance with industry security

frameworks, such as ISO, NIST, CIS, or HITRUST.

## 8. PHASING

a) When a party propounds discovery requests pursuant to Fed. R. Civ. P. 34, the parties agree to phase the production of ESI as follows in subparagraphs (b) - (e) below.

b) Defendants' initial production will be from the following sources and custodians: electronic repositories maintained by Noah Medical, which were or continue to be accessed by the following individuals: Enrique Romo, Diana Cardona Ujueta, Kenneth Nip, Leobardo Centeno Contreras, Maziyar Keshtgar, Sarika Pandhare, and Mouslim Tatarkhanov.

c) Plaintiffs' initial production will be from the following sources and custodians: electronic repositories maintained by Plaintiffs, which were or continue to be accessed by the following individuals: Angelina Barton-Johonnot, Chauncey Graetzel, Laura Irigoyen, Tracy Lopes, Salvador Trejo, Haoran Yu, Enrique Romo, Diana Cardona Ujueta, Kenneth Nip, Leobardo Centeno Contreras, Mouslim Tatarkhanov, Maziyar Keshtgar, Sarika Pandhare, and Jian Zhang.

d) Following the initial production, the parties will continue to prioritize the order of subsequent productions.

## 9. DOCUMENTS PROTECTED FROM DISCOVERY

a) Pursuant to Fed. R. Evid. 502(d), the production of a privileged or work-product-protected document, whether inadvertent or otherwise, is not a waiver of privilege or protection from discovery in this case or in any other federal or state proceeding. For example, the mere production of privileged or work-product-protected documents in this case as part of a mass production is not itself a waiver in this case or in any other federal or state proceeding.

b) Communications involving trial counsel that post-date the filing of the complaint need not be placed on a privilege log. Communications may be identified on a

privilege log by category, rather than individually, if appropriate.

c)   The parties shall provide privilege logs on a rolling basis within two weeks of the

date of production of documents from which materials were withheld. Where justified

by the size of the production or number of items to be logged, the parties will agree

to reasonable extensions of that two-week deadline.

**10. MODIFICATION**

This Stipulated Order may be modified by a Stipulated Order of the parties or by the

Court for good cause shown.


**IT IS SO STIPULATED**, through Counsel of Record.


Dated:   August 30, 2023                    **O'MELVENY & MYERS LLP**

                                            */s/ David R. Eberhart*
                                            David R. Eberhart
                                            Laura Burson
                                            Two Embarcadero Center, 28th Floor
                                            San Francisco, CA 94111
                                            Telephone: (415) 984-8700
                                            Facsimile: (415) 984-8701
                                            E-mail: deberhart@omm.com

                                            *Attorneys for Plaintiffs Auris Health, Inc.,*
                                            *Verb Surgical Inc., and Cilag GmbH*
                                            *International*

Dated:    August 30, 2023

**WILSON SONSINI GOODRICH & ROSATI**

*/s/ Stephanie Cheng*
Charles T. Graves
Stephanie Cheng
One Market Plaza, Spear Towers
Suite 3300
San Francisco, CA  94105-1126
*Attorneys for Defendants Noah Medical Corporation, Enrique Romo, Diana Cardona Ujueta, Kenneth Nip, Mouslim Tatarkhanov, Maziyar Keshtgar, and Sarika Pandhare*

Dated:    August 30, 2023

**CONRAD | METLITZKY | KANE LLP**

*/s/ Felipe Corredor*
Mark Conrad
Felipe Corredor
Four Embarcadero Center, Suite 1400
San Francisco, CA 94111
*Attorneys for Defendant Leobardo Centeno Contreras*

**IT IS ORDERED** that the forgoing Agreement is approved.

Dated: August 31, 2023    _____

UNITED STATES MAGISTRATE JUDGE

**ATTESTATION**

Pursuant to Civil Local Rule 5-1(h)(3) regarding signatures, I attest that concurrence in the filing of this document has been obtained from the other party signatories.

Dated: August 30, 2023                          /s/ David R. Eberhart
                                                David R. Eberhart

# ATTACHMENT A

A.1.   <u>Image Files</u>. Files produced in *.tif format will be single page black and white *.tif images at 300 DPI, Group IV compression. To the extent possible, original orientation will be maintained (i.e., portrait-to-portrait and landscape-to-landscape). Each *.tif image will be assigned a unique name matching the production number of the corresponding page. Such files will be grouped in folders of no more than 1,000 *.tif files each unless necessary to prevent a file from splitting across folders. If a file, *e.g.*, a PDF file, exceeds 500 *.tif images, the producing party may produce the file natively rather than in *.tif format. Files will not be split across folders and separate folders will not be created for each file. Production ("Bates") numbers shall be endorsed on the lower right corner of all images. This number shall be a unique, consistently formatted identifier that will:

    i.    be consistent across the production;

    ii.   contain no special characters; and

    iii.  be numerically sequential within a given file.

Bates numbers should be a combination of an alpha prefix along with an 8 digit number (e.g., ABC00000001). The number of digits in the numeric portion of the Bates number format should not change in subsequent productions. Confidentiality designations, if any, will be endorsed on the lower left corner of all images and shall not obscure any portion of the original file.

A.2.   <u>File Text</u>. Except where a file's full text cannot be extracted (*e.g.*, when a file has been redacted under assertion of privilege or other protection from disclosure), full text will be provided in the format of a single *.txt file for each file (*i.e.*, not one *.txt file per *.tif image). Where ESI contains text that cannot be extracted, the available *.tif image will be OCR'd or, as applicable, the redacted native file will have its text re-extracted, and file-level text will be provided. Searchable text will be produced as file-level multi-page UTF-8 text files with the text file named to match the beginning production number of the file. The full path of the text file must be provided in the *.dat data load file.

A.3.    <u>Word Processing Files</u>. If word processing files, including without limitation Microsoft Word files (*.doc and *.docx), are produced in *.tif image format, such *.tif images will display tracked changes, comments, and hidden text.

A.4.    <u>Presentation Files</u>. If presentation files, including without limitation Microsoft PowerPoint files (*.ppt and *.pptx), are produced in *.tif image format, such *.tif images will display comments, hidden slides, speakers' notes, and similar data in such files.

A.5.    <u>Spreadsheet or Worksheet Files</u>. If spreadsheet files, including without limitation Microsoft Excel files (*.xls or *.xlsx), are produced in *.tif image format, such *.tif images will display hidden rows, columns, and worksheets, if any, in such files.

A.6.    <u>Parent-Child Relationships</u>. Parent-child relationships (*e.g.*, the associations between emails and their attachments) will be preserved. Email and other ESI attachments will be produced as independent files immediately following the parent email or ESI record. Parent-child relationships will be identified in the data load file pursuant to Paragraph A.13 below.

A.7.    <u>Dynamic Fields</u>. Files containing dynamic fields such as file names, dates, and times will be produced showing the field type (e.g., "[FILENAME]" or "[AUTODATE]"), rather than the values for such fields existing at the time the file is processed.

A.8.    <u>English Language</u>. To the extent any data exists in more than one language, the data will be produced in English, if available. If no English version of a file is available, the Producing Party shall not have an obligation to produce an English translation of the data.

A.9.    <u>Embedded Objects</u>. Some Microsoft Office and .RTF files may contain embedded objects. Such objects typically are the following file types: Microsoft Excel, Word, PowerPoint, Project, Outlook, and Access; and PDF. Subject to claims of privilege and immunity, as applicable, objects with those identified file types shall be extracted as separate files and shall be produced as attachments to the file in which they were embedded. If the file with the embedded object is produced in native format, the embedded object need not be extracted.

A.10.   <u>Compressed Files</u>. Compressed file types (i.e., .CAB, .GZ, .TAR. .Z, .ZIP) shall be decompressed in a reiterative manner to ensure that a zip within a zip is decompressed into the lowest possible compression resulting in individual files.

A.11.   <u>Scanned Hardcopy Documents.</u>

    a.    In scanning hardcopy documents, multiple distinct documents should not be merged into a single record, and single documents should not be split into multiple records (*i.e.*, hard copy documents should be logically or physically unitized).

    b.    For scanned images of hard copy documents, OCR should be performed on a document level and provided in document-level *.txt files named to match the production number of the first page of the document to which the OCR text corresponds. OCR text should not be delivered in the data load file or any other delimited text file.

    c.    In the case of an organized compilation of separate hardcopy documents—for example, a binder containing several separate documents behind numbered tabs—the document behind each tab should be scanned separately, but the relationship among the documents in the binder should be reflected in proper coding of the family fields set out below.

A.12.   <u>Production Numbering</u>.

In following the requirements of Paragraph A.1, the Producing Party shall take reasonable steps to ensure that attachments to documents or electronic files are assigned production numbers that directly follow the production numbers on the documents or files to which they were attached. If a production number or set of production numbers is skipped, the skipped number or set of numbers will be noted. In addition, wherever possible, each *.tif image will have its assigned production number electronically "burned" onto the image.

A.13.   <u>Data and Image Load Files.</u>

      a.    <u>Load Files Required</u>. Unless otherwise agreed, each production will include a data load file in Concordance (\*.dat) format and an image load file in Opticon (\*.opt) format.

      b.    <u>Load File Formats</u>.

          i.    Load file names should contain the volume name of the production media. Additional descriptive information may be provided after the volume name. For example, both ABC001.dat or ABC001_metadata.dat would be acceptable.

          ii.    Unless other delimiters are specified, any fielded data provided in a load file should use Concordance default delimiters. Semicolon (;) should be used as multi-entry separator.

          iii.    Any delimited text file containing fielded data should contain in the first line a list of the fields provided in the order in which they are organized in the file.

      c.    <u>Fields to be Included in Data Load File</u>. For all documents or electronic files identified as relevant, not privileged, and produced, the following metadata fields for each document or electronic file, if available at the time of collection and processing and unless such metadata fields are protected from disclosure by attorney-client privilege or work-product immunity or otherwise prohibited from disclosure by law or regulation, will be provided in the data load file pursuant to subparagraph (a). The term "Scanned Docs" refers to documents that are in hard copy form at the time of collection and have been scanned into \*.tif images. The term "Email and E-Docs" refers to files that are in electronic form at the time of their collection, irrespective of the form (TIFF-Plus or native format) in which they are produced.

| Field | Sample Data | Scanned Docs | Email and E-Docs | Comment |
|---|---|---|---|---|
| PRODBEG [Key Value] | ABC00000001 | Yes | Yes | Beginning production number |
| PRODEND | ABC00000008 | Yes | Yes | Ending production number |
| PRODBEGATT | ABC00000009 | Yes | Yes | Beginning production number of parent in a family |
| PRODENDATT | ABC00001005 | Yes | Yes | Ending production number of last page of the last attachment in a family |
| CUSTODIAN | Smith, John | Yes | Yes | Custodian who possessed the document or electronic file |
| CUSTODIANSALL | Smith, John; Doe, Jane; Jones, James | N/A | Yes | List of custodians who owned a duplicate version of the original document family or top level document based on the method of deduplication applied (separated by ";"). Includes primary custodian. |
| NATIVEFILE | Natives\001\001\ABC00000001.xls | N/A | Yes | Path and file name for native file on production media |
| FILEDESC | Microsoft Office 2007 Document | N/A | Yes | Description of the type file for the produced record. |
| FOLDER | \My Documents\Document1.doc | N/A | Yes | Original source folder for the record produced. |
| FILENAME | Document1.doc | N/A | Yes | Name of original electronic file as collected. |

| Field | Sample Data | Scanned Docs | Email and E-Docs | Comment |
|---|---|---|---|---|
| DOCEXT | DOC | N/A | Yes | File extension for email or e-doc |
| PAGES | 2 | Yes | Yes | Number of pages in the produced document or electronic file (not applicable to native file productions). |
| AUTHOR | John Smith | N/A | Yes | Author information as derived from the properties of the document. |
| DATECREATED | 10/09/2005 | N/A | Yes | Date on which non-email file was created as extracted from file system metadata |
| DATELASTMOD | 10/09/2005 | N/A | Yes | Last date on which non-email file was modified as extracted from file system metadata |
| SUBJECT | Changes to Access Database | N/A | Yes | "Subject" field extracted from email message or metadata properties of the document |
| FROM | John Beech | N/A | Yes | "From" field extracted from email message |
| TO | Janice Birch | N/A | Yes | "To" field extracted from email message |
| CC | Frank Maple | N/A | Yes | "Cc" or "carbon copy" field extracted from email message |
| BCC | John Oakwood | N/A | Yes | "Bcc" or "blind carbon copy" field extracted from email message |

| Field | Sample Data | Scanned Docs | Email and E-Docs | Comment |
|---|---|---|---|---|
| DATESENT | 10/10/2005 | N/A | Yes | Sent date of email message (mm/dd/yyyy format) |
| TIMESENT | 10:33 am | N/A | Yes | Sent time of email message, time zone set to GMT |
| DATERCVD | 10/10/2005 | N/A | Yes | Received date of email message (mm/dd/yyyy format) |
| TIMERCVD | 10:33 am | N/A | Yes | Received time of email message, time zone set to GMT |
| [1]CHAT_START_DATE | 1/10/2021 | N/A | Yes | Date only portion of the first message of the transcript |
| CHAT_START_TIME | 4:04:14 PM | N/A | Yes | Time only portion of the first message of the transcript |
| CHAT_END_DATE | 1/10/2021 | N/A | Yes | The date and time of the last message of the transcript |
| CHAT_END_TIME | 5:17:21 PM | N/A | Yes | Time only portion of the last message of the transcript |

[1] The parties include here the fields that begin with "CHAT" without prejudice to any argument that the production of particular chat or instant message data, such as that from Slack, is unduly burdensome or not proportionate to the needs of the case.

| Field | Sample Data | Scanned Docs | Email and E-Docs | Comment |
|---|---|---|---|---|
| CHAT_ROOM_NAME | Ryan.Kim@company3.com/Samantha.Henderson@company1.com private chat | N/A | Yes | Name of chat room used in the communications. When a chat room name is not assigned users are presented as "User A/User B/private chat" |
| CHAT_SENDERS | Ryan.Kim@company3.com;Samantha.Henderson@company1.com | N/A | Yes | All the identifiers (nicknames) of the participants who sent at least one message in the transcript |
| CHAT_RECIPIENTS | Ryan.Kim@company3.com;Samantha.Henderson@company1.com | N/A | Yes | All the identifiers (nicknames) of the participants who received at least one message in the transcript. For channels this field can include a distribution list |

| Field | Sample Data | Scanned Docs | Email and E-Docs | Comment |
|---|---|---|---|---|
| CHAT_PARTICIPANTS | Henderson, Samantha (Samantha.Henderson @company1.com);Kim, Ryan (Ryan.Kim @company3.com) | N/A | Yes | Combined list of all the identifiers (nicknames) of the participants who sent, received or reacted to at least one message in the transcript. For channels this field can include a distribution list |
| ALL_PARTICIPANTS | John Beech, Janice Birch, Frank Maple | N/A | Yes | For emails only; lists all participants in lesser-included emails that, without email threading, would have been subject to review |
| CONFIDENTIALITY | HIGHLY CONFIDENTIAL | Yes | Yes | Text of confidentiality designation, if any |
| TEXTPATH | Text\001\001\ABC00000001.txt | Yes | Yes | Path to *.txt file containing extracted or OCR text |
| FILE_PRODUCED_IN_NATIVE_AND_TIFF | Yes | N/A | YES | Limited to documents reproduced in native format |
| MD5_HASH | 309997447f..... | N/A | Yes | MD5 Hash value for ESI |
| PRODVOL | VOL001 | Yes | Yes | Name of the Production Volume |

A.14.   <u>Files Produced in Native Format</u>.

 a. For any electronic file produced initially as a native file in accordance with Paragraph 6.b of the Protocol above, the file shall be given a file name consisting of a unique Bates number and, as applicable, a suitable confidentiality designation; for example, "ABC00000002_CONFIDENTIAL" (which may be abbreviated as "CONFI") or "ABC00000002_HIGHLY CONFIDENTIAL — ATTORNEYS EYES ONLY" (which may be abbreviated as "HCAEO" or "ABC00000002_HIGHLY CONFIDENTIAL —SOURCE CODE" (which may be abbreviated as "HCSC"). For each such native file, the production will include a *.tif image slipsheet (i) indicating the production number of the native file, (ii) with respect to any confidential document, setting forth the full confidentiality language applicable to the native file as set out in the protective order, and (iii) stating "File Provided Natively." To the extent that it is available, the original or redacted file text shall be provided in a file-level multi-page UTF-8 text file with a text path provided in the *.dat file; otherwise the text contained on the slipsheet shall be provided in the *.txt file with the text path provided in the *.dat file.

 b. For any electronic file produced in native file format following production of a TIFF-image in accordance with Paragraph 6.a, the file shall be given a file name consisting of (i) the Bates number of the first page of the associated TIFF-image and (ii) as applicable, a suitable confidentiality designation. For each such native file, the production will include a new .DAT file (i) indicating the production number of the native file, (ii) identifying the path to the native file, (iii) adding a field stating "Yes," indicating that the file was produced in both native and TIFF formats, and (iv) linking the metadata associated with the originally produced TIFF image to the newly produced native file.

A.15.   <u>Production Media</u>. Unless otherwise agreed, documents and ESI will be produced on optical media (CD/DVD), external hard drive, secure FTP site, or similar electronic format. Such

media should have an alphanumeric volume name; if a hard drive contains multiple volumes, each volume should be contained in an appropriately named folder at the root of the drive. Volumes should be numbered consecutively (ABC001, ABC002, etc.). Deliverable media should be labeled with the name of this action, the identity of the producing Party, and the following information: Volume name, production range(s), and date of delivery.

A.16.   <u>Encryption of Production Media</u>. To maximize the security of information in transit, any media on which documents or electronic files are produced may be encrypted by the producing Party. In such cases, the producing Party shall transmit the encryption key or password to the requesting Party, under separate cover, contemporaneously with sending the encrypted media. The receiving parties in this matter are on notice that certain data produced may originate from custodians in the European Union and the receiving parties therefore agree to follow the strictest security standards in guarding access to said data.

**ATTACHMENT B**

**FORENSIC INSPECTION PROTOCOL AGREEMENT**

This agreement ("Agreement") is effective the date the ESI Order is entered ("Effective Date") by and among Plaintiffs Auris Health, Inc. ("Auris"), Verb Surgical Inc. ("Verb"), and Cilag Gmbh ("Cilag") (collectively, "Plaintiffs"), Defendants Noah Medical Corporation ("Noah Medical"), Enrique Romo ("Romo"), Diana Cardona Ujueta ("Cardona Ujueta"), Kenneth Nip ("Nip"), Leobardo Centeno Contreras ("Centeno"), Mouslim Tatarkhanov ("Tatarkhanov"), Maziyar Keshtgar ("Keshtgar"), and Sarika Pandhare ("Pandhare") (collectively, "Defendants"). Sometimes hereinafter, Romo, Cardona Ujueta, Nip, Centeno, Tatarkhanov, Keshtgar, and Pandhare may collectively be referred to as "Individual Defendants" and Plaintiffs and Defendants may collectively be referred to as "the Parties."

This Agreement governs the forensic inspection of any personal computing, communication, or other electronic device for which Plaintiffs seek a forensic copy that is in the possession, custody, or control of a Defendant that contains either personal health information or personally-identifying information of an Individual Defendant or their family ("Personal Device").[2] Nothing in this Agreement shall relieve any of the Parties of any obligation to search for responsive material in its possession, custody, or control. By entering this Agreement, Plaintiffs do not concede that any of Defendants are permitted to possess any trade secret or confidential information of any Plaintiff. None of Defendants will assert that this Agreement, or any term thereof, is evidence of a failure to take reasonable measures to preserve the secrecy of the trade secret information of any of Plaintiffs.

If a Personal Device is identified by an Individual Defendant to contain personal health information or personally-identifying information, then the Individual Defendant's counsel will notify Plaintiffs' counsel within five business days upon such identification. The Individual Defendant will make the Personal Device available for forensic analysis within five business days by a third-party forensic neutral jointly engaged by Plaintiffs and Defendants ("Forensic Neutral")[3] as follows:

1.    <u>Forensic Analysis</u>

Individual Defendant shall provide the Forensic Neutral with any usernames, access passwords, decryption keys, two factor authentication codes or other information needed to allow the Forensic Neutral to perform the procedures outlined in this Agreement.

---

[2] For purposes of this Agreement, "personal health information" is defined as any information that can be used to identify an individual that was created, used, or disclosed in the course of providing a health care service such as diagnosis or treatment. "Personally-identifying information" is defined as sensitive personal information that permits the identity of an individual to whom the information applies to be reasonably inferred by either direct or indirect means, such as an individual's social security number, passport number, driver's license, state identification number, taxpayer identification number, patient identification number, banking information, and biometric records.

[3] The Forensic Neutral will review and confirm that it can perform the duties outlined in this Agreement. To the extent that the Forensic Neutral cannot perform a duty outlined in this Agreement, the Parties will meet and confer with the Forensic Neutral to find a reasonable alternative.

First, Individual Defendant will provide the Forensic Neutral with access to the Personal Device for imaging and analysis at a location convenient for Individual Defendant. Individual Defendant will provide the Forensic Neutral with any usernames, access passwords, decryption keys, two factor authentication codes or other information needed to allow the Forensic Neutral to image and analyze the Personal Device. The Forensic Neutral shall expeditiously image the Personal Devices and return the Personal Device to Individual Defendant within 24 hours of completion of imaging, so that Individual Defendant may use the Personal Devices in the ordinary course. Individual Defendant will be obligated to preserve any information on the Personal Devices, to the extent that any exists.

2.    Chain of Custody

Upon receipt of the Personal Device, the Forensic Neutral shall prepare documentation identifying the chain of custody of the Personal Device from the date of the receipt forward.

3.    Preparation for Inspection

Prior to imaging the Personal Device, the Forensic Neutral shall: (a) take all necessary digital photographs of the Personal Device and shall record the specifications and serial number identifiers for the Personal Device to document its current state and physical properties; (b) properly prepare suitable forensic storage media ("Target Media") for receipt of any forensic images or forensic collections created through the Forensic Neutral's execution of any directives under this Agreement by wiping said Target Media or by using new target media not previously used; and (c) confer with counsel for the Parties to determine if any Personal Device can be wiped in its entirety without the necessity for the execution of searching, or any other directives under this Agreement.

4.    Imaging

The Forensic Neutral shall make two (2) identical physical forensic bit-stream images, or forensically sound collections for accounts or devices incapable of having a full bit-stream copy made, of each Personal Device onto separate electronic media (the "Forensic Images"): (1) one forensic copy shall remain untouched as an original image; and (2) a second forensic copy shall be used as a "working copy" for the Forensic Neutral to carry out the terms of this Agreement.

The Forensic Neutral shall maintain physical custody of the Forensic Images using a cradle-to-grave chain of custody documentation process until otherwise jointly directed in writing by all Parties to this Agreement or by court order. The Forensic Images will be securely stored in an appropriate evidence room at the Forensic Neutral's office (with a limited access area appropriate for the storage of electronic evidence). Only the Forensic Neutral will be permitted to perform searches on the images.

5.    Forensic Review

The Forensic Neutral will conduct the forensic review as follows:

a.   <u>Search of the Personal Device</u>

  i.  Once the parties have reached an agreement on the relevant time period for forensic review or analysis, or such time period has been determined by the Court ("Agreed-Upon Time Period"), the Forensic Neutral shall produce the following reports, regardless of whether the Parties have agreed on search terms for analysis, subject to the Agreed-Upon Time Period:

    1. List the creation and deletion dates and time of each user account on the device;

    2. List the date  and time of each installation of an operating system on the device and the user account that caused installation of the operating system;

    3. List the date and time of each reformatting or partitioning of any hard drive or storage device associated with the device and the user account that caused the reformatting or partitioning;

    4. List any backup devices or services used with the device and the dates of backup files;

    5. List any backup files present on the device and the dates of such files;

    6. List the date and time of each restoration of the device from a backup, the date and time of the backup used for restoration, and the user account associated with that restoration;

    7. List the identity of all applications and utilities installed on the device, the date of installation, and the date of deletion, if any; and

    8. Describe any use of data deletion or wiping utilities, such as CyberScrub Privacy Suite, Privacy Eraser Pro, or Evidence Eliminator.

  ii. Once the parties have reached an agreement on the search terms for the forensic analysis and review, or such terms have been determined by the Court, the Forensic Neutral shall produce the following reports:

    1. File listing of all files obtained by a search using search terms agreed upon by the Parties that were in existence, modified, or deleted during the Agreed-Upon Time Period. All compressed files will be expanded to display the file names and associated metadata contained in each compressed file;

    2. USB or other memory storage devices report providing the name of any and all devices inserted or connected, first and last

insertion/connection dates and times, and serial number of devices that were inserted or connected during the Agreed-Upon Time Period;

3. Files accessed report providing list of all files accessed that hit upon the agreed search terms that were accessed during the Agreed-Upon Time Period, showing drive accessed from, date accessed, user account accessing, and path to data accessed;

4. Recycle or deletion report providing file list, including (a) all files that hit upon the agreed search terms and were recycled, deleted, or removed according to the $USNJ or FSEVENTs or other similar logs during the Agreed-Upon Time Period and (b) an indication of whether each file can be recovered, whether from slack space or otherwise;

5. Print report providing report of all data printed during the Agreed-Upon Time Period; and

6. Provide web browsing history reports for the Agreed-Upon Time Period separately for each web browser on the device that includes reports in excel or another appropriate format of the following categories:

   a. Cloud Services URLs, including, but not limited to, the following:

      - icloud. (iCloud)

      - box. (Box)

      - 1blu.de (1blu Online Speicher)

      - 4shared. (4shared)

      - acronis. (Acronis Backup)

      - adrive. (ADrive)

      - alfafiles. (Alfafile)

      - alfafilespremium. (Alfafile)

      - alibabacloud.com (Alibaba Cloud)

      - altdrive. (AltDrive)

      - aomeitech. (AOMEI)

- asuswebstorage. (Asus Web Storage)

- aws.amazon.com/s3/ (Amazon S3)

- backblaze. (Back Blaze)

- barracudanetworks. (Baracuda Network)

- bitcasa. (Bitcasa)

- bullguard. (BullGuard)

- calvadrive.de (Calvadrive)

- carbonite. (Carbonite)

- catshare. (CatShare)

- centfile. (CentFile)

- chedrive. (CheDrive)

- clicknupload. (Click n Upload)

- cloud.huawei. (Huawei Cloud)

- cloud.md.de (Mobilcom-debitel)

- cloud.naver. (Naver Cloud)

- cloud.telekom. (Telekom)

- amazon.com/clouddrive (Amazon Cloud Drive)

- comodo. (Comodo)

- crashplan. (Crash Plan)

- dailyuploads. (Daily Uploads)

- ddownload. (DDownload)

- delldatasafe. (Dell Data Safe)

- diino. (Diino)

- disk.yandex. (Yandex)

- dollydrive. (Dolly Drive)
- drive.google (Google Drive)
- drop.download (DropAPK)
- dropapk. (DropAPK)
- dropbox. (Dropbox)
- dropgalaxy. (DropGalaxy)
- dropmyemail. (Drop my email)
- dropmysite. (Drop my site)
- dropsend. (DropSend)
- easybytez. (Easybytez)
- egnyte. (Egnyte)
- elephantdrive. (Elephant Drive)
- extmatrix.com (ExtMatrix)
- fastclick. (FastClick)
- fastshare. (FastShare)
- fboom. (FileBoom)
- file.a (File.al)
- filebonus. (FileBonus)
- filefox. (FileFox)
- filejoker. (FileJoker)
- filejokerpremium. (FileJoker)
- filerio. (FilerlO)
- filesanywhere. (Files Anywhere)
- fileshark. (lFileShark)

- filesmonster (FilesMonster)

- filespace. (FileSpace)

- free-hidrive.com (Strato HiDrive)

- gfi. (GFI)

- handybackup. (Handy Backup)

- hightail. (Hightail)

- hitfiles. (HitFile)

- hornetdrive.com (Hornet Drive)

- i.mi.com (Mi Cloud)

- iaso. (Iaso)

- ibackup. (IBackup)

- icedrive.com (icedrive Cloud)

- icerbox. (Icerbox)

- idgard.de (iDGard)

- idrive. (idrive)

- infinit. (infinit)

- internxt. (internxt)

- intoupload. (Intoupload)

- jumpshare. (Jumpshare)

- jungledisk. (Jungle Disk)

- katfile. (KatFile)

- katfilepremium. (KatFile)

- Keep2Share. (Keep2Share)

- keepvault. (Keep Vault)

- leitz-cloud.com (leitz)

- linkifier.com (linkifier)

- linkvertise. (linkvertise)

- livedrive. (Livedrive)

- mailbigfile. (BigFile)

- mediafire. (MediaFire)

- mega. (Mega)

- mega4up. (Mega 4 up)

- memopal. (Memopal)

- mimedia. (Mimedia)

- mozy. (Mozy Online Backup)

- nextcloud.com (Nextcloud Cloud)

- nitroflare. (Nitroflare)

- nordlocker.com (Nordlocker Cloud)

- oboom. (Oboom)

- one.ubuntu. (Ubuntu.One)

- onedrive. (OneDrive)

- opendrive. (Open Drive)

- pan.baidu.com (Baidu WangPan)

- pcloud.com (pCloud Cloud)

- produkte.web.de/online-speicher (Web.de)

- polarbackup. (Polar Backup)

- rapidgator. (RapidGator)

- restfllee. (RestFile)

- rg.to. (RapidGator)

- safesync. (Safe Sync)

- sendspace. (SendSpace)

- sharefile. (Sharefile)

- skydrive. (Sky Drive)

- solidflles. (Solid Files)

- sosonlinebackup. (SOS Online Backup)

- spideroak. (Spider OAK)

- storage.driveonweb.de (DriveOnWeb)

- storegridcloud. (Store Grid Cloud)

- strato.de (Strato)

- Subyshare. (Subyshare)

- sugarsync. (Sugar Sync)

- sync.com (Sync.com Cloud)

- syncplicity. (SyncPlicity)

- thruinc. (Thru)

- tresorit.com (tresorit Cloud)

- turbobit. (TurboBit)

- tusfiles. (TusFiles)

- uloz. (Uloz.to)

- ulozto. (Uloz.to)

- unitrends. (UniTrends)

- updatestar. (Update Star)

- upfiles. (Upfile)

- upload-4ever. (JP4Ever)

- uploadboy. (UploadBoy)

- uploadev. (UploadEV)

- uploadrar. (UploadRAR)

- upstores. (Upstore)

- uptobox. (Uptobox)

- uptoboxpremium. (Uptobox)

- usenet. (UseNet)

- userupload. (Userupload)

- webshare. (WebShare)

- wetransfer. (WeTransfer)

- wipfiles.net (WipFiles)

- workupload. (WorkUplaoad)

- worldbytez. (Worldbytez)

- wuala. (Wuala)

- yunfile. (YunFile)

- zippyshare. (ZippyShare)

- zmanda. (Zmanda)

- zoolz. (Zoolz)

- zumodrive. (Zumo Drive)

b.  Downloads that hit on the Agreed-Upon Search Terms[4]

---

[4]  By using the phrase, "Agreed-Upon Search Terms," the Parties agree to meet and confer in good faith to agree on: (1) specific search terms for relevant materials and activities, such as (a) Plaintiffs' documents and information; (b) research into methods of exfiltration and deletion of evidence, as well as possible consequences of the same; and (c) research about competing products, competitors, and employment with competitors; and (2) definitions of phrases contained herein.

       c.   Browser activities that hit on the Agreed-Upon Search Terms

iii.   Produce email listings for emails obtained by searches using the Agreed-Upon Search Terms sent or received during the Agreed-Upon Time Period. The email listings shall, at a minimum, contain the sent date, received date, to, from, cc, bcc, subject line and attachment name. Emails from and to counsel for an Individual Defendant or Noah Medical shall be excluded; counsel shall meet and confer to prepare a list of emails and/or domains of counsel to be submitted to the Forensic Neutral for this purpose.

iv.   For purposes of all reports and listings produced by the forensic neutral, files shall be limited to the following file types (whether capitalized or not):

- .pdf
- .docx
- .doc
- .pptx
- .ppt
- .xlsx
- .xls
- .csv
- .eml
- .emlx
- .msg
- .pst
- .zip
- .rtf
- .mp4
- .mpeg
- .jpg;

- .jpeg
- .GSHEET
- .GSLIDE
- .CCVT
- .VTT
- .M3U
- .M4A
- .SLDASM
- .SLDPRT
- .SLDRW
- .STL
- .png
- .igs
- .X_t
- .py (source code)
- .webp
- .mov
- .wav
- .wma
- .zipx
- .rar
- .gz
- .txt
- .L01

- .Lx01
- .html
- .dat
- .bmp
- .hex
- .adoc
- .pst
- .ost
- .mbox
- .nsf
- .tar
- .7z
- .h
- .c
- .accdb
- .app
- .ascii
- .asv
- .avi
- .bat
- .bin
- .build
- .builder
- .cc

- .cfg
- .chk
- .chm
- .clang-format
- .cmake
- .commoncodeengineering
- .commonprojectoptions
- .conf
- .config
- .cpp_parameters
- .cproject
- .cxx
- .data
- .dconfig
- .dd
- .deb
- .descriptors
- .diff
- .dot
- .download
- .EAP
- .ecc
- .edvm
- .esp

- .fdef
- .fdi
- .fig
- .filters
- .gif
- .gitattributes
- .gitignore
- .gprm
- .groovy
- .heic
- .hpp
- .ico
- .idl
- .ifs
- .ihd
- .in
- .ini
- .jsc
- .json
- .ld
- .lfu
- .local
- .log
- .lua

- .m
- .m4
- .make
- .manifest
- .mat
- .md
- .me
- .metainfo
- .mht
- .mnt
- .model
- .mp4
- .ninja
- .ninja_deps
- .ninja_log
- .odp
- .ods
- .odt
- .one
- .os
- .personalprojectoptions
- .pin
- .pinmod
- .potx

- .privatedependencylist
- .pro
- .profile
- .project
- .properties
- .proto
- .prototxt
- .pub
- .pxd
- .pyc
- .pyx
- .qm
- .qml
- .qmlc
- .qmltypes
- .qrc
- .qss
- .rc
- .rtf
- .S
- .sample
- .sd
- .sh
- .so

- .srec
- .stl
- .suppress
- .svd
- .svg
- .sysinit
- .tab
- .tcl
- .template
- .tmpl
- .tra
- .tri
- .ts
- .ui
- .us
- .vcxproj
- .vsdx
- .wg
- .wmv
- .x_t
- .xcf
- .xdf
- .xml
- .xz

- .yaml

    v. Each of these reports shall at a minimum, contain the file name, file extension, full path, creation date/time, last modified/written date/time, last accessed date time, and MFT modified date/time (where applicable), and MD5 hash value.

    vi. The Forensic Neutral shall produce the reports and email listings identified above to counsel for Plaintiffs, Noah, and the individual who provided the device. Counsel shall treat potentially confidential information of the other party (for example, a white-noise hit that is an irrelevant Noah Medical business file) as attorneys-eyes-only pending de-designation discussions between counsel. Plaintiffs will identify the documents it believes contain Plaintiffs' documents or information, if any, to counsel for Defendants within two weeks from receipt. Where justified by the size of the reports and email listings, the parties will agree to reasonable extensions of that two-week deadline. The Parties' counsel will meet and confer in good faith on this identification, and shall then provide joint direction to the forensic neutral regarding the list of documents that may contain Plaintiffs' documents or information, if any. By entering this Agreement, Defendants do not concede that any identified documents in this subsection affirmatively contain Plaintiffs' confidential information.

    vii. The Forensic Neutral shall create a copy of the files identified pursuant to section 6(vi) on an external drive or electronically, as agreed upon by the Parties, and transmit those files to counsel for Plaintiffs, Noah, and the individual who provided the device.

6.   <u>Remediation of Data</u>

If the Parties agree to the deletion of any files or other information contained on the Personal Device after review of the file listings, the Parties shall direct the Forensic Neutral to take steps to remediate all such information, deleting such information from the Device(s) without wiping other information that may be present. Prior to taking any steps for remediation, the Forensic Neutral shall image the device to preserve a pre-remediation copy of the Personal Device. After completing the remediation, the Forensic Neutral shall re-image the Personal Device before returning it to the Individual Defendant. Each Individual Defendant agrees to make available to the Forensic Neutral for remediation any Personal Device returned to them pursuant to section 5 above.

7.   <u>Additional Investigation</u>

Following delivery of the reports identified in 5, Counsel for Plaintiffs, Noah, or the individual defendant providing a device may request that additional steps be taken by the Forensic Neutral with respect to a given device. The parties will meet and confer in good faith regarding any such request.

8.      Disposal of Data

Absent a joint direction from all Parties, or order of a court, the Forensic Neutral will not provide to, or share with, any other person or entity the Personal Device or any information thereon.

9.      No Ex Parte Communications

Other than as described and permitted above, and other than communication of a ministerial nature, absent written agreement to the contrary, the Forensic Neutral shall not engage in any *ex parte* communications with Plaintiffs, Defendants, or the Parties' respective counsel. Instead, the Parties shall communicate with the Forensic Neutral via joint e-mail or joint conference calls.  Any party hereto may request a conference call among all Parties by e-mailing each of the signatories below and each of the Parties hereto shall participate in any such calls.

10.      Cost of Imaging and Review by Forensic Neutral

The Parties shall evenly split the costs of the Forensic Neutral, subject to review of an estimate from the Forensic Neutral.

11.      Meet and Confer

The Parties agree that, if any disputes develop between the Parties regarding the matters described herein, the Parties agree to first discuss and attempt to resolve those differences by meeting and conferring in good faith. To the extent the parties fail to resolve those differences, they may present that dispute to the Court using the applicable discovery resolution procedures.